**In re GENCOR INDUSTRIES, INC., Debtor.**

Nos. 00–03597–6J1, 00–03598–6J1, 00–03599–6J1, 00–03601–6J1, 00–03602–6J1, 00–03604–6J1.

United States Bankruptcy Court, M.D. Florida, Orlando Division.

Aug. 28, 2002.

Paul S. Singerman, Berger Davis & Singerman, P.A., Miami, FL, for debtor.

Jules S. Cohen, Akerman, Senterfitt & Eidson, P.A., Orlando, FL, for Petitioning Creditors.

### MEMORANDUM OPINION ON FEE ENHANCEMENT REQUESTED IN APPLICATION BY PACHULSKI, STANG, ZIEHL, YOUNG & JONES FOR FEE AUGMENTATION

KAREN S. JENNEMANN, Bankruptcy Judge.

This case came on for hearing on February 13, 2002, on the Supplemental Application by Pachulski, Stang, Ziehl, Young & Jones for Fee Augmentation (Doc. No. 678) and the Oppositions filed by the Lender Group[1] as well as the United States Trustee (Doc. Nos. 693 and 697). The applicant, Pachulski, Stang, Ziehl,

---

**1.** The Lender Group consists of the following lenders: Credit Lyonnais New York Branch, BHF USA Capital Corp., Balanced High–Yield Fund l., Ltd., Bank Austria Creditanstalt Corporate Finance, Inc., ML CBO IV (Cayman) Ltd., Pamco Cayman Ltd., Skandinaviska Enskilda Banken Corp., SunTrust Bank, ABN Amro Bank NV, ING Capital Advisors LLC and the ING Capital Senior Secured High Yield Fund, L.P.

Young & Jones, represents the debtor in these Chapter 11 cases. The debtor has paid all of Pachulski's fees and costs incurred during the case except for a $300,000 fee enhancement. Both the secured creditors and the United States Trustee oppose this bonus. For reasons stated below, and after considering the evidence and the positions of the parties, the Court allows the fee enhancement in the full amount of $300,000 pursuant to certain restrictions.

The debtor, Gencor Industries, Inc., is a large publicly traded company that markets its products and services internationally. Gencor employs 875 people worldwide and manufactures and assembles substantially all of the products it sells. Gencor's primary business is the manufacture of large road building plants. Gencor also produces process machinery that transforms bulk materials into end products. At the time this case was filed, Gencor's process machinery division was divided into two business groups, the Construction Equipment Group ("CEG"), which produces process machinery for highway construction materials, and Consolidated Process Machinery ("CPM"), which manufactures process machinery used in the production of food products.

In 1997, Gencor sought to expand its process machinery product lines. To that end, Gencor acquired two subsidiaries, Gumaco Ltd. Group of Companies ("Gumaco") and ACP Holdings PLC ("ACP"). The Lender Group financed Gencor's acquisition of Gumaco and ACP and received, in exchange, a lien on essentially all of Gencor's assets. Unfortunately, neither the Gumaco nor the ACP acquisitions were as profitable as projected.

Gencor's acquisition of both Gumaco and ACP were plagued with problems. Gumaco's new equipment sales declined shortly after Gencor acquired the company. As to

ACP, Gencor identified accounting irregularities that were not discovered during previous audits. Gencor re-audited ACP's books and records and restored ACP to profitability but not without significant cost and not before a securities class action lawsuit was filed against Gencor's senior management.

Gencor began to experience serious financial difficulties in 1999. Some of the financial problems arose because of the acquisition of Gumaco and ACP and the debtor's expansion into new industries. Other problems were more systemic and operational. Eventually, Gencor was unable to make regular payments on its secured debt. The Lender Group became increasingly concerned about the debtor's future ability to repay the outstanding loans totaling over $110,000,000.

The Lender Group demanded changes. In response, Gencor's management hired and fired a continuing succession of professionals each offering a different and conflicting professional recommendation. The situation was confusing. Creditor concerns continued to rise, as Gencor had no focused solution to their financial problems.

The Lender Group then turned to litigation for a solution. Initially, the secured creditors filed a complaint to enforce its liens against Gencor's assets and the assets of certain Gencor subsidiaries. Later, they sought a temporary restraining order seeking turnover of sale proceeds and an application asserting a lien on and demanding the turnover of Gencor's 1998 tax refund. Ultimately, in April 2000, several members of the Lender Group filed an involuntary bankruptcy petition seeking the entry of an order of relief against Gencor and certain of its subsidiaries. At that time, the debtor had secured claims exceeding $110,000,000 and unsecured claims exceeding $45,000,000.

At this point, the debtor hired Pachulski to help frame a response to the involuntary petition. From April through August 2000, Gencor, with Pachulski's help, strenuously opposed the entry of an order of relief believing that the bankruptcy filing would substantially harm the debtor's ongoing business. During this period of time, Pachulski received approximately $650,000 in payments from the debtor.

A several day trial on the involuntary petition was scheduled to begin on September 13, 2000. The parties had worked around the clock all summer taking numerous depositions and completing other discovery. On the eve of trial, the parties looked diametrically opposed with significant conflicting interests. Yet, over the weekend before the trial, Pachulski's attorneys made great headway in resolving these looming and possible catastrophic disputes. Only minutes before the trial was to start, the debtor and the secured creditors reached an oral, omnibus stipulation. The stipulation sketched the skeleton of the ultimate plan of reorganization confirmed in this Chapter 11 case. The stipulation required both parties to make substantial concessions. The most significant concession from the debtor's prospective was its agreement to the entry of an order of relief, to sell a significant subsidiary of the debtor, and to make a principle payment of at least $60,000,000 by a date certain. In return, the secured creditors gave up the right to collect accruing interest until the end of the case. Without Pachulski's efforts to convince the debtor's management that this was the best solution, the debtor never would have agreed to the stipulation that ultimately benefited all major creditor groups. The Court specifically finds that without this settlement at a very early stage, all creditors would have received a lesser return and that lesser return would have been paid only after significant additional cost and time.

Moreover, the Court specifically finds that, although many parties worked together on the terms of the stipulation, Pachulski alone is responsible for persuading their client to substantially change tactics and agree to proceed with a Chapter 11 bankruptcy case.

After the order of relief was entered on September 14, 2000, the debtor formally moved to retain Pachulski as its bankruptcy counsel (Doc. No. 127). An order authorizing the retention was entered shortly thereafter (Doc. No. 138). In addition, the debtor retained co-counsel, the firm of Berger, Davis & Singerman, to handle local bankruptcy matters relating to the Chapter 11 proceeding. During the course of the Chapter 11 case, the Singerman firm billed and was paid fees of approximately $327,000. For the same period of time, Pachulski billed and was paid 100% of its requested fees of $476,314.50. Therefore, from the date that the involuntary petition was filed on April 5, 2000, until the date of the confirmation hearing, July 11, 2001, all bankruptcy attorneys for the debtor received payments for bankruptcy related services of approximately $1,453,314. Of this total amount, Pachulski received approximately $1,126,314.

Pachulski now requests an additional fee enhancement of $300,000, which equals approximately 27% of the fees already paid to Pachulski. At the time they were retained, no fee enhancement or contingency payment arrangement was discussed. However, after the case proceeded so favorably to all constituencies, the current directors of the debtor independently voted to request court approval for a fee enhancement of $300,000 to recognize and to reward Pachulski for extraordinary and exemplary work performed during the case. The debtor's directors firmly believe the reorganized company can afford to pay the bonus.

All parties agree that Pachulski performed excellently. The Court orally confirmed the debtor's plan of reorganization at a hearing held on July 11, 2001, within one year of entry of the order of relief. The plan provides for payment of 100% of all outstanding claims albeit with some payments extended over a four to six year period. In addition, the equity owners retained in full their equity interest in the debtor.

To numerically quantify the success of the debtor's reorganization, at the time the order of relief was entered on September 14, 2000, the debtor owed its secured creditors approximately $110,000,000. The debtor's stock was trading at approximately $.60 per share. In addition, many unsecured creditors had not been paid between the filing of the involuntary petition in April and the entry of the order of relief in September. During the case, due to the sale of one of the debtor's subsidiaries, the debtor reduced the amount due to the Lender Group to no more than $33,000,000. Similarly, unsecured claims exceeding $45,000,000 existed on the day the involuntary petition was filed. These unsecured claims were reduced to approximately $3,000,000 by the time that the debtor's plan of reorganization initially was confirmed. By confirmation, the debtor's shares were trading at $3.75 per share, a tremendous increase from the $.60 per share at the time the case was filed.

Pursuant to the Order Granting Debtor's Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Chapter 11 Professionals (Doc. No. 255), this Court established a procedure for the estate professionals to obtain interim payment of fees and expenses incurred during the course of this Chapter 11 case. The Order allowed monthly payments to all professionals in the case. Indeed, all professionals have received all payments requested in full during this Chapter 11 case, and they received interim payments on a regular monthly basis during the case. Accordingly, no professional, including Pachulski, had to wait for any delayed payment due to him or her. Further, Pachulski had received a retainer of approximately $950,000 when the debtor retained the firm in spring 2000. As discussed earlier, Pachulski earned $1,126,314 for their work done for this debtor.

Pachulski earned these fees with little contested litigation but with much finesse and negotiation. Between the time the debtor agreed to the stipulation with its creditors in September and the confirmation hearing in July, ten months later, Pachulski had assisted in the successful sale of the debtor's subsidiary for a price exceeding $50,000,000, successfully negotiated a reduction in the Citrisuco unsecured claim from $20,000,000 to $250,000, successfully negotiated claims arising from a class action suit involving securities law claims asserted at over $20,000,000 to nothing, favorably resolved all tax priority claims asserted by the IRS, and obtained the consensual confirmation of a plan of reorganization.

All creditor groups benefited from Pachulski's work. All secured creditors will receive payment in full within four years. Unsecured creditors will receive 100% of their claims. All parties obtained this unusually successful result with minimal litigation in a relatively short time.

During the four-year repayment period, the debtor has agreed to make regular principle payments to the Lender Group. Shortly after the confirmation hearing, and due to the erosion of the country's economy in whole during 2001, the debtor had requested a modification of the confirmed plan to allow for the deferral of the early principle payments due to the Lender

Group. In December 2001, the modification was approved which allowed, but did not require, the debtor to skip the early principle payment. Pursuant to the testimony introduced at a hearing held on February 13, 2002, however, the debtor's Chief Executive Officer, Mr. Elliott, informed the Court that Gencor probably did not need these principle deferrals. Yet, at the time Pachulski's request for a fee enhancement initially was heard, the Court was uncertain as to whether the debtor would be able to make all of the required payments under the plan on a timely basis. Subsequently, at a hearing held on August 22, 2002, Mr. Elliott confirmed that Gencor indeed did timely make all payments required by the confirmed plan to both secured and unsecured creditors.

With this short summary of Pachulski's work in this case, they now seek a bonus of $300,000. The enhancement is approximately 27% of the total fees already paid to them. The United States Trustee and the Lender Group objected to the fee enhancement due to the uncertain success of the Plan. In its objections, the United States Trustee indicated that, in February, it was unclear whether the debtor could make the payments required under the plan because Gencor had not yet made a payment to creditors.

The objectors further argued that the results obtained during the case were not based solely upon the efforts of Pachulski. First, the Lender Group argues the case was successful because *all* parties agreed to omnibus stipulation early in the case. The terms of the stipulation were strenuously negotiated and the resolution is not solely attributable to Pachulski's work. Moreover, the objectors rightly assert Pachulski did not work alone. Along with Pachulski, Gencor hired the Singerman firm to perform services as co-counsel in addition to other professionals who were hired and paid to assist in functions that are normally performed by debtor's counsel. In light of the total fees paid by Gencor and the high hourly rate approved by the Court, both objecting parties regard the lodestar figure as adequate and reasonable compensation. They see no basis for a fee enhancement.

 In evaluating requests for a fee enhancement, bankruptcy courts have core jurisdiction under 11 USC § 330 to determine the allowance of all fees. 11 U.S.C. § 330 (1993). Pursuant to Section 330(a), the court may award "reasonable compensation for actual, necessary services rendered" by the attorney or other professionals "based on the nature, the extent and the value of such services, the time spent on such services and the cost of comparable services" in addition to "reimbursement for actual, necessary expenses."[2] Analytically, Section 330(a) sets

---

2. *Id.* Prior to the enactment of Section 330, Federal Rules of Bankruptcy Procedure Rule 219(c)(1) governed awards of reasonable compensation giving "due consideration to the nature, extent, and value of the services rendered" as well as "to the conservation of the estate and the interest of creditors." Fed. R. Bankr.P. 219(c)(1). One of these factors— conservation of the estate—created a severe limitation on an attorney's fee award. *See Massachusetts Mutual Life Ins. Co. v. Brock,* 405 F.2d 429 (5th Cir.1968) (reversed fee award because bankruptcy court failed to consider the public interest in conserving the estate even though the case was complex and the results obtained were excellent), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1748, 23 L.Ed.2d 220 (1969). Bankruptcy attorneys could only expect to receive the least amount appropriate, never the most. In response to the difficulties obtaining fair and reasonable compensation for services rendered by professionals, Congress later omitted any notion of economy in awarding attorneys' fees in Section 330. 11 U.S.C. § 330 (1993). The legislative history of Section 330 indicates that Congress intended to encourage reasonable compensation for services rendered in a bankruptcy

up a two-tiered test for determining whether and in what amount to compensate bankruptcy attorneys and other professionals. First, the court must be satisfied that the attorney performed actual and necessary services. Second, the court must assess a reasonable value for those services.

■■■ The analysis under Section 330(a) primarily involves the lodestar method approved by the Supreme Court. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Under *Hensley,* the starting point for determining the amount of a reasonable fee is the number of hours reasonably expended multiplied by a reasonable hourly rate. *Id.* at 434, 103 S.Ct. 1933. The Supreme Court established the lodestar method to provide courts with an objective basis on which to make an initial estimate of the value of an attorney's services. *Id.* However, the Supreme Court added that once the court determines the objective lodestar amount, the court may, in its discretion, consider other factors that may lead to an adjustment of the figure upward or downward.[3]

■■■ Prior to the Supreme Court's decision in *Hensley,* when determining a reasonable fee courts considered the factors delineated in *Johnson v. Georgia Highway Express, Inc.,* the leading case in the area of awarding attorneys' fees. *Johnson v.* *Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). By and large, these factors are still applicable in assessing the original lodestar amount. The Fifth Circuit in *Johnson* held that the hours claimed or spent on a case should not be the sole basis for a determination of a fee. *Id.* Instead, the Court declared the following twelve factors should be considered in evaluating requests for attorneys' fees:

(1) the time and labor required,

(2) the novelty and difficulty of the question,

(3) the skill requisite to perform the legal services properly,

(4) the preclusion of other employment by the attorney due to acceptance of this case,

(5) the customary fee,

(6) whether the fee is fixed or contingent,

(7) time limitations imposed by the client or the circumstances,

(8) the amount involved and the results obtained,

(9) the experience, reputation and ability of the attorneys,

(10) the undesirability of the case,

(11) the nature and length of the professional relationship with the client, and

(12) awards in similar cases.[4]

---

case at the same rate as an attorney or other professional would be compensated for performing comparable services in other types of cases. *See* H.R.Rep. No. 595, 95th Cong., 2d Sess., ch. 3 at 329–30, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6285–86.

3. *Id.* In calculating a reasonable attorney's fee, the bankruptcy court has broad discretion and its exercise of discretion will not be disturbed unless it was abused. *See In re Hillsborough Holdings Corp.,* 221 B.R. 917 (Bankr. M.D.Fla.1998) (citing *Hensley,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40).

4. *Id.* at 717–9. While *Johnson* arose from a Title VII class action, the Fifth Circuit in *Matter of First Colonial Corp. of America* later held that the guidelines established in *Johnson* were "equally useful whenever the award of reasonable attorney's fee is authorized by statute." *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974); *Matter of First Colonial Corp. of America,* 544 F.2d 1291, 1299 (5th Cir.1977).

The Supreme Court in *Blum* later held that courts should use these factors in calculating the initial lodestar amount, not to adjust the award. *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Courts should adjust the lodestar only in rare and exceptional cases, provided the court finds counsel's representation superior to that which would have been expected considering the rates requested. *Id.* at 900, 104 S.Ct. 1541.

Following these decisions, the Eleventh Circuit Court of Appeals approved using the *Johnson* factors to establish the hourly rate for professional services and acknowledged fee enhancements are appropriate to reward superior work in unusual cases. *Norman v. Housing Authority of City of Montgomery,* 836 F.2d 1292 (11th Cir. 1988). In determining the reasonable hourly rate, however, the Court emphasized the important factor of attorney skill and services provided in considering the rates requested. The Court held that a reasonable hourly rate should be "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience and reputation." *Norman,* at 1299. Legal skill, however, is a multi-faceted concept that has no intrinsic value unless it is used to further the client's interest in obtaining a just result, quickly and economically. *Id.* at 1300. In this case, neither party asserts that Pachulski failed to earn the fees already paid or that the lodestar amount requires any adjustment. The objecting parties assert, however, that Pachulski is not entitled to any more fees because the total fees already paid are reasonable and are based on an appropriately high hourly rate reflecting the skill provided.

Fee enhancements are appropriate, however, when a skilled lawyer obtains *extraordinary* results efficiently, quickly, and effectively. Indeed, the Eleventh Circuit Court of Appeals in *Norman* and subsequently in *Grant v. George Schumann Tire & Battery Co.,* 908 F.2d 874 (11th Cir.1990), require courts to consider other factors that may lead to an adjustment of the fee upward *or* downward, the most important consideration to a fee increase or decrease being the results obtained. If the results obtained were exceptional, then some enhancement of the lodestar is appropriate.

The Bankruptcy Court in *In re Farah* awarded a 50% fee enhancement based on results obtained. *In re Farah,* 141 B.R. 920 (Bankr.W.D.Tex.1992). The Bankruptcy Court found that a bonus was due because the attorney negotiated a difficult and highly publicized dispute for a very successful outcome. *Id.* At the outset of the case, several secured creditors faced losses exceeding $125,000 each, and unsecured creditors expected to receive less than a 5% recovery. *Id.* at 922. As a result of the attorney's efforts, every secured creditor was paid in full with interest, and unsecured creditors received substantial distributions. *Id.* Moreover, the debtor kept assets worth approximately $3.5 million. *Id.*

The Bankruptcy Court in *In re Atlas* similarly awarded a fee enhancement based on results obtained where the evidence indicated that the attorney handled difficult and unforeseen circumstances and yet maximized the value of the assets in the estate. *In re Atlas,* 202 B.R. 1019 (Bankr.S.D.Fla.1996). The attorney individually kept the debtor's stock sale from failing by taking on the additional and unanticipated responsibility of brokering the sale of stock, which saved the additional expense of hiring a broker. *Id.* The attorney sold a dubious asset of the estate for $840,000, a price well in excess of the expected value. *Id.* Based upon the supe-

rior quality of work, which went beyond the scope of what was reasonably expected, the Bankruptcy Court awarded a 15% fee enhancement. *Id.*

Most recently, however, the Bankruptcy Court in *In re Vista Foods USA, Inc.* awarded a fee enhancement based on the value of the attorney's services to the estate, the effect that these services had on creditors, and the exceptional results obtained.[5] The Bankruptcy Court noted that a bankruptcy case is unique in our legal system because disputes typically are not resolved in the traditional adversarial manner. The value of an attorney's services to the estate is a significant factor to consider in deciding a fee enhancement because in a traditional suit one party wins and the other loses, but, in a bankruptcy case, the goal is not to "win" but to maximize the value of assets. *Id.* The effect an attorney's services have on creditors is a second significant factor. In addition to giving debtors a fresh start by increasing the value of the reorganized debtor's assets, bankruptcy cases also try to increase payments to creditors on their claims. *Id.* An extraordinarily successful bankruptcy is one where the reorganized debtor leaves Chapter 11 with a substantial increase in its value *and* creditors receive 100% of their claims. Therefore, in determining whether a fee enhancement is appropriate, courts should determine whether the attorney's services maximized the value of the assets retained by the reorganized debtor and whether the services resulted in substantial increased distributions to creditors.

The Bankruptcy Court in *Vista Foods* found that, when the attorneys were retained, creditors already had filed an involuntary Chapter 7 petition against the debtor, the debtor had ceased doing business, and its principals had abandoned the company. *Id.* The law firm was employed to represent the disgruntled creditors, successfully avoided a fraudulent lien in the amount of $2,000,000, and objected to a questionable $2,000,000 proof of claim by the former operations manager of the debtor. *Id.* As a result of the law firm's efforts, all creditors were paid in full with interest. *Id.* In awarding a fee enhancement of approximately 60%, the Bankruptcy Court noted that involuntary petitions are rare and generally require more work and expertise than an ordinary voluntary bankruptcy petition. *Id.* Moreover, the law firm obtained such success while defending against veiled threats from the debtor and its former principal, which contributed to the difficulty of the case. *Id.*

 Based on the foregoing, fee enhancements are allowed and should be encouraged where the attorney's initiative, perseverance, and skill lead to an extraordinary success quickly, efficiently, and effectively. In considering fee enhancements in a bankruptcy case, courts should examine the way the attorney worked to maximize the value of assets in the case and to increase distributions to all classes of creditors. An attorney's ability to overcome unique and unforeseen obstacles also is relevant. Other important factors to consider include whether the results far exceeded the initial expectations and

---

5. *In re Vista Foods USA, Inc.,* 234 B.R. 121 (Bankr.W.D.Okla.1999). The Bankruptcy Court in *Vista Foods* initially used the lodestar method approved in *Hensley* to calculate a reasonable fee, but did not base its fee enhancement solely on results obtained. Rather the Bankruptcy Court focused on two addi-tional factors—value to the estate and effect on creditors—upon which to base a fee enhancement. The Bankruptcy Court stated it found the authority to select these additional factors in the Supreme Court decision *Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989).

whether the party paying the fee consents to the additional payment.

■ Applying this test to the facts in this case, Pachulski is entitled to receive its requested $300,000 fee enhancement. The party most vocal in seeking the fee enhancement is the reorganized debtor who must pay the additional fees and who can best assess the value of Pachulski's services. From a more objective perspective in reviewing Pachulski's service, the Court finds that the services were superior, significantly maximized the value of the assets in this estate, and will result in a 100% distribution to all creditors in this case.

At the onset the parties looked diametrically opposed with significant conflicting interests. The debtor was strongly resisting the involuntary petition filed by the Lender Group. It was solely through the efforts and skill of Pachulski's attorneys that they convinced the debtor's management to agree to pursue relief in a Chapter 11 reorganization case and to agree to a stipulation that benefited all major creditor groups. If this significant concession was not made by the debtor early, the debtor and all creditors would have received a lesser return after significant additional cost and time. All secured creditors will receive payment in full within four years and unsecured creditors will receive 100% of their claims. No one expected this result in April 2000. At the same time, the value of the debtor's stock substantially increased from $.60 to $3.75 per share. Pachulski was able to accomplish this result with virtually no litigation in a relatively short time, ten months. Attorneys should be rewarded for facilitating consensual resolutions, particularly when

the results achieved are extraordinary. Pachulski's efforts went beyond that of mere first class service. Pachulski's services directly worked to increase the value of the reorganized debtor and to maximize distributions to all creditor groups. The success of this case would not have occurred but for the efforts of Pachulski's counsel.[6] The requested fee enhancement is appropriate and should be allowed.

The Court's only hesitation was a concern raised by the objecting parties—that the debtor would not be able to make payments required under its confirmed plan. The objections were filed shortly after confirmation and before the debtor was required to make any payments. Further, the debtor independently requested an extension of time to make required principal payments to the Lender Group and expressed some concern over its economic prospects post-confirmation. Some uncertainty existed as to whether the debtor could consummate the plan. For that reason, the Court delayed entry of this order for six months to see if the objecting parties were correct.

Fortunately, for all parties, the objecting parties' concerns were unfounded. In the last six months, the debtor has made all payments required under its plan and appears to have a healthy financial future. No reason exists to further delay approval of Pachulski's fee enhancement provided that the debtor can only pay the fee enhancement as long as all payments under its plan are timely made and no payment is in arrears.

*Conclusion.* The Court finds that the results obtained in this case far exceeded the expectations of the parties at the be-

---

**6.** In recognizing the value of Pachulski's services to the debtor and the creditors in this case, the Court in no way intends to belittle the valuable services provided by other pro-

fessionals. All professionals did an excellent job; Pachulski simply is entitled to additional accolades and remuneration for their performance.

ginning of the proceedings based mainly on the efforts of Pachulski. Despite the complexity of the case, Pachulski successfully confirmed a plan of reorganization within ten months obtaining a result without much litigation, which provided for payment in full to all creditors. Pachulski's skill in negotiations greatly enhanced the value of the estate and the eventual return to creditors. Based on the foregoing, the Court awards Pachulski a fee enhancement of $300,000 provided that the debtor can pay this amount only if all payments under its confirmed plan of reorganization are timely made and no payment is in arrears. A separate order consistent with this memorandum opinion will be entered.