**In re CHANNEL MASTER HOLDINGS, INC., et al., Debtors.**

**No. 03–13004(MFW).**

United States Bankruptcy Court, D. Delaware.

May 20, 2004.

Stuart M. Brown, Selinda A. Melnik, Edwards & Angell, L.L.P., Daniel B. Butz, Gregory Thomas Donilon, Gilbert R. Saydah, Jr., Morris, Nichols, Arsht & Tunnell, Mark S. Chehi, Skadden, Arps, Slate, Meagher & Flom, William Anthony Hazeltine, Potter, Anderson & Corroon LLP, Jami B. Nimeroff, Buchanan Ingersoll P.C., Brian A. Sullivan, Werb & Sullivan, Wilmington, DE, Gene B. Tarr, Blanco, Tackabery, Combs & Matamoros, P.A., Winston–Salem, NC, Jeffrey C. Wisler, Connolly, Bove, Lodge & Hutz LLP, Wilmington, DE, for creditors.

William J. Barrett, Barack, Ferrazzano, Kirschbaum, Perlman LLC, Chicago, IL, for respondent.

Joseph J. Bodnar, Francis A. Monaco, Jr., Monzack and Monaco, P.A., Wilmington, DE, for creditor committee.

Montague S. Claybrook, Esq., Navigant Consulting, Inc., L. Jason Cornell, Sheldon K. Rennie, Fox, Rothschild, O'Brien & Frankel, Wilmington, DE, for trustee.

Aaron A. Garber, David B. Stratton, Pepper Hamilton LLP, Wilmington, DE, for debtor.

### AMENDED OPINION[1]

MARY F. WALRATH, Chief Judge.

Before the Court are the final chapter 11 fee applications for the professionals of the Debtors and the Official Unsecured Creditors' Committee ("the Committee"). An Objection was filed by Comerica Bank, as agent for the pre-petition and post-petition lenders ("the Lenders"), to the fees of the Committee's professionals asserting that (1) fees cannot be allowed in an amount greater than the carve-out permitted in the order approving debtor in possession financing and use of cash collateral and (2) the fees requested are excessive. For the reasons set forth below, we sustain the objection in part.

## I. FACTUAL BACKGROUND

On October 2, 2003, Channel Master Holdings, Inc., and its two affiliates (collectively "the Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code. The cases have been administratively consolidated. Prior to the filing, the Debtors had negotiated an agreement to sell substantially all their assets to the Andrews Corporation ("Andrews") for $17 million, which was substantially less than the balance due to the Lenders. On the filing date, the Debtors filed a motion for approval of bid procedures in connection with that sale. The Debtors also filed a Motion for approval of financing and use of cash collateral ("the DIP Financing Motion"). An Interim Order was entered on October 3, 2003, and a final hearing was held on the DIP Financing Motion on October 21, 2003. In the interim, the Committee was formed and selected counsel.

At the final hearing on the DIP Financing Motion, the Debtors presented a budget which capped the fees of the Committee's professionals at $75,000. (Exhibit P–1) The budget also capped fees for the Debtors' professionals ($990,000) and the Lenders' advisors ($350,000). (*Id.*) There was also a miscellaneous category for chapter 11 expenses of $225,000. (*Id.*) The Committee objected to the cap on its professional fees, asserting that it was insufficient especially compared to the caps for the Debtors' and Lenders' professionals. The Lenders argued that, since they were under-secured, the unsecured creditors had no stake in the case and the Lenders should not be required to pay more than minimal fees for the Committee's participation. We granted the DIP Financing Motion and approved the budget but held that we had the authority to allocate the budgeted fees among the professionals on a pro-rata basis.

The Debtors proceeded with the sale process. On November 20, 2003, we entered an order approving the sale of substantially all the Debtors' assets to Andrews for $18.1 million. The sale closed the next day. After applying the proceeds to the Lenders' claims, there remains due

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

to them over $25 million. The parties were thereafter unable to agree upon a wind-down budget. As a result, the case was converted to chapter 7 on December 3, 2003.

The professionals for the Debtors and the Committee filed final fee applications for all services rendered prior to conversion. The fees requested are as follows:

Pepper Hamilton (Debtors' attorneys): Fees of $331,330.25; expenses of $32,404.28; and retainer of $100,475.79.

FTI Consulting, Inc. (Debtors' financial advisors): Fees of $262,606; expenses of $15,208.75; and retainer of $59,870.30

SG Cowen Securities Corp. (Debtors' investment bankers): Monthly fees of $100,000; expenses of $14,425.87; and success fee of $605,000 to be paid from sale proceeds.[2]

Traub, Bonacquist & Fox (Co-counsel to Committee): fees of $144,966 and expenses of $3,401.65.

Monzack and Monaco, P.A. (Co-counsel to Committee): Fees of $23,790.50 and expenses of $2,480.92.

J.H. Cohn LLP (Committee's financial advisors): fees of $98,970.50 and expenses of $6,531.60.

■ The chapter 7 Trustee objected to the fees to the extent that the professionals seek recovery from the chapter 7 estate rather than from any retainers held or from the carve-outs in the DIP Financing Order budget. All of the professionals acknowledged that fees allowed but not paid from the budget (or from retainers) are subordinate to the chapter 7 administrative fees by virtue of section 726(b).[3] Consequently, the chapter 7 Trustee did not press his objection.

The Lenders objected to fees sought by the Committee's professionals in excess of the $75,000 carve-out in the budget attached to the DIP Financing Order. The Lenders also objected to the fees sought as excessive for the tasks that the Committee was required to perform. They argue that the Committee's professionals were cognizant of the fact that the unsecured creditors were "out of the money" and should have restricted their services accordingly.

A hearing was held on the fee requests on March 5, 2004, after which we permitted supplemental submissions to be filed by the parties. Supplemental objections to specific time entries were filed by the Lenders on March 12, and a response was filed by the Committee on March 19, 2004.

## II. *JURISDICTION*

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), (M) & (O).

## III. *DISCUSSION*

### A. *Application of Cap in DIP Financing Order*

■ The Lenders assert that the DIP Financing Order precludes the Court from approving any fees in excess of the $75,000

---

**2.** Because this fee application is scheduled for hearing on May 21, 2004, it is not considered here.

**3.** A portion of the fee request of the Debtors' counsel included post-conversion fees of $14,786.50 and expenses of $6,482.19. Although the Supreme Court has held that, after conversion to chapter 7, debtor's counsel fees may not be paid by the estate, it did acknowl-edge that those fees may be paid from a retainer received prior to conversion. *Lamie v. United States Trustee,* — U.S. —, —, 124 S.Ct. 1023, 1032, 157 L.Ed.2d 1024 (Jan. 26, 2004). Since the post-conversion fees and expenses sought by counsel for the Debtors are less than the remaining retainer, they may be paid from it.

cap on fees of the Committee's professionals. The Committee argues that the cap is not binding and that the Court so ruled at the time of the DIP Financing Order. It asserts that its cap is particularly outrageous when compared to those allowed for the Debtors' and Lenders' professionals ($990,000 and $350,000, respectively). The Committee argues that, even if the $75,000 cap is enforceable, any excess fees requested by its professionals would, nonetheless, be payable from the budget's miscellaneous category ($225,000).

■ We agree with the Committee that the existence of a cap on fees for Committee's professionals in the DIP Financing Order does not limit allowance or payment of fees to those professionals. A court has the inherent power to direct disgorgement of fees by any professional and to redistribute those disgorged fees among all professionals in order to assure that none receives more than its pro rata share. *See, e.g., In re Unitcast, Inc.,* 219 B.R. 741, 753 (6th Cir. BAP 1998) ("disgorgement is a remedy within the discretion of bankruptcy judges as the final arbiters of professional fee requests under [sections] 330 and 331 of the Code"); *Specker Motor Sales Co. v. Eisen,* 300 B.R. 687, 691 (W.D.Mich.2003) (holding that disgorgement "honors the intent of the Code and the classification of the remaining creditors as equal, none having a superpriority over another"); *In re Penn State Clothing Corp.,* 204 B.R. 161, 164 (Bankr.E.D.Pa. 1997) (noting that, where Chapter 11 plan has been confirmed prior to conversion, disgorgement is not necessary, but pay-

ments have to be deducted from total amount of remaining claim); *In re Lockwood Corp.,* 216 B.R. 628, 636 (Bankr. D.Neb.1997) (explaining that interim compensation is subject to disgorgement when estate is administratively insolvent); *In re Metropolitan Elec. Supply Corp.,* 185 B.R. 505, 511–12 (Bankr.E.D.Va.1995) (finding chapter 7 trustee's request for disgorgement of chapter 11 professional fees appropriate to the extent that payments exceed professionals' pro rata distribution amount).

■ We stated at the hearing on the DIP Financing Order our intent to consider disgorgement of fees, despite the carve-out caps in the budget, in the event it became appropriate. It has now come to pass that, indeed, the estate is administratively insolvent and reallocation of fees may be warranted. If we were to allow all requested fees and enforce the carve-out caps as the Lenders argue we should, the Debtors' professionals would receive 100% of their fees, while the Committee's professionals would receive approximately 27%. After first applying the $160,346.09 retainers they held as of the petition date,[4] the fees and expenses requested by the Debtors' professionals total $595,629.06 against a cap of $990,000. In contrast, the Committee's professionals seek $282,141.17 against a cap of $75,000. After applying that cap, the Committee's professionals are still owed $207,141.17.

However, there are sufficient funds available from the $225,000 cap for miscellaneous expenses[5] to cover the fees of the Committee's professionals even without in-

4. Counsel for the Debtors assert that the DIP Financing Order requires that the retainers be applied before the cash collateral or DIP financing is used. (Second and Final Application of Pepper Hamilton LLP, Counsel for the Debtors for Compensation and Reimbursement of Expenses Incurred for the Period

November 1, 2003, through January 31, 2004, at ¶ 4.)

5. It appears that all other chapter 11 administrative expenses have been paid in full without invading the carve-out for miscellaneous expenses.

vading the $394,370.94 balance of the Debtors' cap. Therefore, we find it unnecessary to require the Debtors' professionals to disgorge any fees.

## B. *Review of Fee Requests Generally*

■■■ Even if there are no objections, we have an independent duty to review all fee requests of professionals retained in a chapter 11 case to assure that the services rendered were necessary and appropriate and that the fees requested are reasonable. *See, e.g., In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833, 841 (3d Cir.1994). The court "must protect the estate, lest overreaching attorneys or other professionals drain it of wealth which by right should inure to the benefit of . . . creditors." *Id.* at 844.

■■■ Under section 330(a), the court may award "reasonable compensation for actual, necessary services rendered" by the attorney and by other professionals "based on (i) the nature of the services, (ii) the extent of the services, (iii) the value of the services, (iv) the time spent on the services, and (v) the cost of comparable services in non-bankruptcy cases." *Busy Beaver*, 19 F.3d at 840. "[T]he court should not allow compensation for (i) unnecessary duplication of services; or (ii) services that were not (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case." 11 U.S.C. § 330(a)(4)(A). The applicant bears the burden of proving that the fees and expenses sought are reasonable and necessary. *See, e.g., Zolfo, Cooper & Co. v. Sunbeam–Oster Co., Inc.*, 50 F.3d 253, 260 (3d Cir.1995).

■■■ Analytically, section 330(a) provides a two-tier test for determining whether and in what amount to compensate professionals in bankruptcy cases. *In re Gencor Industries, Inc.*, 286 B.R. 170, 176–77 (Bankr.M.D.Fla.2002). First, the court must be satisfied that the professionals performed actual and necessary services. *Id.* at 177. Second, the court must assess a reasonable value for those services. *Id.*

## C. *Objection to Fees of Committee's Professionals*

The Lenders assert that the fees requested by the Committee's professionals must be reduced because they performed many unnecessary services and because the value of the necessary services performed is substantially less than requested. From the inception of the case, the unsecured creditors appeared to be entitled to nothing: the Debtors filed a motion to sell substantially all their assets to Andrews for far less than the secured creditors were owed. Given these circumstances, the Lenders argue, the Committee's professionals should not have performed services that were neither designed nor likely to result in a recovery for their constituency.

The Committee's professionals assert, however, that the services they rendered in this case were in furtherance of their fiduciary duty and were designed to enhance the possibilities of a recovery for unsecured creditors. The fact that they were not successful should not mandate denial of their fees.

■■■ We agree with the Committee that success is not a prerequisite to allowance of fees in chapter 11. "Section 330(a)'s 'benefit' and 'necessary' criteria do not require a professional to be 100% successful." *In re Cenargo Int'l, PLC*, 294 B.R. 571, 595 (Bankr.S.D.N.Y.2003). However, we do not think that chapter 11 is a license to perform services and generate fees in a vacuum without considering the possibilities of recovery for the professional's constituents. "[T]he Court must conduct an objective inquiry 'based upon what

services a reasonable [professional] would have performed in the same circumstances'." *Id.* at 595 (quoting *In re Ames Dep't Stores Inc.*, 76 F.3d 66, 72 (2d Cir. 1996)).

In this case, we conclude that a reasonable professional representing the Committee would have performed many of the services performed by the professionals in this case, but not to the extent that the professionals did in this case.

### 1. *Key Employee Retention Plan*

■ The Lenders state that the Committee spent too much time analyzing and objecting to the Key Employee Retention Plan ("KERP") proposed by the Debtors because any reduction in the cost of that plan would not have benefited the unsecured creditors until an additional $25 million was received by the estate and paid to the Lenders. We disagree. It was reasonable for the Committee to review and oppose the KERP. Such plans often propose excessive bonuses for senior management of the Debtors, on the theory that the bonuses are necessary to retain competent employees with knowledge of the Debtors' operations. Often Committees are successful in reducing the amounts paid under such plans by arguing that the number of employees covered or the amount to be paid is excessive. Reductions in the amounts paid under those plans typically free additional working capital to allow the Debtors to survive, thereby enhancing recovery for all creditors. Further, because the KERP was proposed early in this case, the Committee was not able to wait until after the sale (when it became clear that unsecured creditors would get no recovery) to oppose the motion.

However, under the circumstances of this case, where the Debtors were proposing a quick sale of their businesses for substantially less than half what the Lenders were owed, it was unlikely that any reduction in the KERP payments would have resulted in a recovery for unsecured creditors. The cost of the KERP was essentially being borne totally by the Lenders. In fact, after extensive investigation and negotiation, the Committee was able to achieve only a facial change to the benefit of unsecured creditors (reducing the KERP by $250,000 only if the Lenders were paid in full). In fact, the Lenders were not paid in full and the reduction was never effective. Yet, the efforts of the Committee professionals in getting this "reduction" totaled almost $34,000. We find this excessive and conclude that a reasonable professional in these circumstances would have spent no more than $5,000 in reviewing the KERP. Consequently, we will allow only 15% of the fees requested by the Committee professionals relating to the KERP motion. The disallowance will be done pro rata based on the amount of time spent by all professionals on this matter.

### 2. *Sale*

■ The Lenders also complain that the Committee's professionals spent excessive time (over $103,000) in connection with the sale process. They argue that, since the initial bid was approximately 40% of the secured debt, it was highly unlikely that there would have been any recovery for unsecured creditors from the sale. We disagree with the Lenders on this point. Although the initial bid was less than the Lenders' claims, we are aware of situations where an auction in bankruptcy has resulted in substantially increased bids. We have even had cases where the ultimate sale resulted in a recovery for unsecured creditors (and even shareholders) although it was originally thought that those constituencies had no chance for a distribution.

Such results have often come through the efforts of the Committee in insisting upon bid procedures that are fair and in seeking to locate additional interested bidders. Thus, we are not prepared to conclude that these efforts were unwarranted; in fact, they were part of the fiduciary duty owed by the Committee to its constituents. We will, therefore, allow fees for this work.

### 3. *High Hourly Rates*

 The Lenders also complain that both counsel and the financial advisor for the Committee improperly staffed the engagement by using an excessive number of professionals and having senior partners do the vast majority of the work. They point out that over 79% of the time spent by the Traub firm and more than 83% of the time spent by the Cohn firm was spent by senior personnel with high hourly billing rates.

The Committee's professionals respond that they could not afford to staff the case with junior personnel because it was on a very fast track. It required senior people with expertise in finance, sales procedures and business operations. Thus, they argue, the staffing level was appropriate.

We agree with the Committee that a fast track case does require more senior personnel and that the exigencies of this case required that the senior personnel do the bulk of the work. We note that the case essentially lasted only two months. Had the case lasted longer, the Committee could have been more efficient in use of its personnel. However, given the need for prompt action, we find that the staffing of the case by the Committee's professionals was not unreasonable and, therefore, will not reduce the fees requested on this basis.

### 4. *Duplication of Efforts*

 In addition, the Lenders complain about duplication of efforts by the Traub firm because, in many instances, there was more than one senior attorney present at a hearing or meeting. The Committee argues that this was necessary because each had a different expertise (finance, sales and business operations).

We note preliminarily from our review of the fee applications that the Traub firm did largely avoid billing the estate for duplicative work. The time entries reflect many inter-office conferences which were billed only by the junior person. Therefore, overall, there was not an excessive amount of duplication of effort.

However, we do agree with the Lenders criticism to a certain degree. We note that the senior personnel at the Traub firm are experienced bankruptcy attorneys, all of whom have expertise in DIP financing, bankruptcy sale procedures and evaluation of debtors' business operations. Since the Committee had senior attorneys handling the case, it was not necessary for more than one professional to attend the hearings or the auction. Therefore, we will disallow $7,920 in duplicative time entries by the Traub firm, as delineated on Exhibit A attached hereto.

### 5. *Analysis of Lenders' Liens*

 The Lenders assert that Monzack and Monaco spent too much time analyzing the perfection of the Lenders' liens, especially since the task was not completed by the time the case was converted. The entries identified by the Lenders total $14,287.50.

We disagree with the Lenders. It was the duty of the Committee's professionals [6]

---

**6.** The Debtors had conceded the validity of the Lenders' liens in the DIP Financing Or-

der, reserving to the Committee the right to contest them.

to analyze and, if appropriate, contest the liens of the Lenders. If the liens were avoided, it would have resulted in a recovery for the unsecured creditors. The fact that the task was not completed because of the conversion is no reason to disallow the fees incurred for this work; Monzack and Monaco note that they have turned over their work on this task to the chapter 7 Trustee for completion. We find this an appropriate task for the Committee's professionals to perform, and the amount of time spent was not excessive. As a result, we will allow these fees.

### 6. *Retention and Fee Application Preparation*

■ The Lenders also complain that Monzack and Monaco spent an inordinate amount of time preparing retention and fee applications for themselves and the other professionals for the Committee. They identify $2,045.50 [7] in time entries spent on this task.

We are cognizant of the problem caused when a large part of counsel's time is spent preparing fee applications. As a result, we have often instructed counsel to stop preparing monthly fee applications when no substantive work is being performed to save excessive charges against the estate. We have generally disallowed fees for preparing fee applications where they exceed 20% of the time covered by the fee application. In this case, the time spent was less than 9% of the total fees requested. This does not represent an inordinate amount of time. Therefore, we will allow the fees as requested.

### 7. *Excessive Time by Financial Advisor*

■ Finally, the Lenders complain that the amount of time charged by the Committee's financial advisor, J.H. Cohn, was simply excessive. They point, as examples, to the 15.1 hours spent by Cohn in preparing a flash report, 61.6 hours spent reviewing the work product of the Debtors' financial advisor, and 18.9 hours spent reviewing the Debtors' historical financials. They argue that these are particularly excessive since Cohn used predominantly senior personnel.

We agree with the Lenders' assessment that the Committee's financial advisor spent an excessive amount of time on this engagement. We note that over $14,000 was spent in reviewing historical financial information and operating results and over $6,000 in analyzing the Debtors' projections. Since this case from the beginning contemplated a liquidation of the Debtors' businesses, this time does not appear to have rendered much of a benefit to the Debtors' estates or creditors. Consequently, we will disallow $10,000 of these fees.

### D. *Fees of Debtors' Professionals*

Other than the limited objection of the chapter 7 Trustee, which is not being pressed, there were no objections to the fees requested by the Debtors' counsel. As noted above, those fees were considerably less than the retainers held and the carve-out provided in the DIP Financing Order. Further, since the allowed fees of the Committee's professionals can be paid in full from the carve-outs for them and the miscellaneous chapter 11 expenses, disgorgement of fees from the Debtors' professionals is not necessary.

We have reviewed the fee requests of the Debtors' professionals and are satisfied that they represent reasonable compensation for actual and necessary services rendered to the estate. Therefore, the fees

---

7. Our calculation is $2,198.50.

requested by the Debtors' professionals will be allowed in full.

## IV. *CONCLUSION*

We will allow the fee requests of the professionals for the Debtors and the Committee for the reasons and in the amounts stated above.

An appropriate Order is attached.

### *AMENDED ORDER*

AND NOW, this 20th day of May, 2004, upon consideration of the final chapter 11 fee applications for the professionals of the Debtors and the Official Unsecured Creditors' Committee, and for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that fees and expenses are allowed to the professionals in the amounts set forth on Exhibit A hereto; and it is further

**ORDERED** that such fees and expenses shall be paid from the carve-outs identified in the DIP Financing Order in accordance with the accompanying Opinion.

### EXHIBIT A

| APPLICANT | PERIOD | FEES | EXPENSES |
|---|---|---|---|
| FTI Consulting Inc.<br>Attn: Christopher J. Kearns<br>622 Third Avenue<br>New York, N.Y. 10017–6707<br><br>Financial Advisors to the Debtors | 10/2/03 -<br>12/3/03 | $262,606.00 | $ 15,208.75 |
| Pepper Hamilton LLP<br>Hercules Plaza<br>Suite 5100<br>1313 Market Street<br>Wilmington, DE 19801<br><br>Counsel for Debtors | 10/2/03 -<br>1/31/04 | $331,330.25 | $ 32,404.28 |
| J.H. Cohn LLP<br>Attn: Clifford A. Zucker<br>333 Thornall Street<br>Edison, NJ 08837<br><br>Financial Advisors to Official<br>Committee of Unsecured<br>Creditors | 10/13/03 -<br>11/30/03 | $ 82,545.35 | $ 6,531.60 |
| Monzack and Monaco, P.A.<br>1201 Orange Street<br>Suite 400<br>Wilmington, DE 19801<br><br>Counsel for Official Committee of<br>Unsecured Creditors | 10/10/03 -<br>12/3/03 | $ 25,455.60 | $ 2,480.92 |
| Traub, Bonacquist & Fox LLP<br>655 Third Avenue, 21st Fl.<br>New York, N.Y. 10017<br><br>Counsel for Official Committee of<br>Unsecured Creditors | 10/10/03 -<br>11/30/03 | $114,919.22 | $ 3,401.65 |