In re TELIGENT, INC., et al., Debtors.

No. 01–12974(SMB).

United States Bankruptcy Court, S.D. New York.

Sept. 13, 2002.

---

Kirkland & Ellis, Matthew N. Kleiman, Esq., Anup Sathy, Esq., Scott R. Zemick, Esq. of Counsel, Chicago, IL, for Debtors.

Simpson Thacher & Bartlett, Steve Fuhrman, Esq., Robert Trust, Esq., of Counsel, New York City, for JPMorgan Chase Bank, as Agent.

## MEMORANDUM DECISION REGARDING IMPLIED CONSENT TO DIFFERENT TREATMENT UNDER 11 U.S.C. § 1129(a)(9)

STUART M. BERNSTEIN, Chief Judge.

The debtors in these chapter 11 cases sought an order confirming their joint chapter 11 plan (the "Plan"). The Court conducted the confirmation hearing on September 5, 2002, received documentary evidence in addition to testimonial evidence through proffers, and based upon the evidence, confirmed the Plan.

Ordinarily, this would end the matter. The confirmation, however, depended upon the determination that certain holders of general administrative and priority claims had agreed, through acquiescence, to different and less favorable treatment than the specific treatment set out in § 1129(a)(9). Because this issue is likely to recur, I write separately to explain my reasoning.

### BACKGROUND

At all relevant times, Teligent, Inc. was the ultimate parent corporation to twenty domestic subsidiaries, all debtors and debtors in possession before this Court, as well as to many non-debtor foreign subsidiaries. Prior to the May 21, 2001 petition date (the "Petition Date"), the debtors were primarily engaged in the business of

providing telecommunication services to wholesale and retail customers.

The debtors financed their operations prior to bankruptcy through bank loans and public debt. As of the Petition Date, they owed approximately $800 million to their pre-petition bank lenders (the "Lenders"), and at the time of the confirmation hearing, still owed approximately $740 million. The pre-petition debt was secured by all or substantially all of debtors' assets. In addition, the debtors owed approximately $740 million to their public noteholders.

Most pertinent to the issue presented, the debtors also accrued a substantial amount of unpaid administrative debt during the chapter 11 cases. On or about June 13, 2001, the Court signed an order authorizing the debtors to use the Lenders' cash collateral. The order provided that all amounts advanced to the debtors would be treated as loans (the "Postpetition Loans"). The Postpetition Loans were entitled to priority in payment over all other administrative claims, and were secured, *inter alia*, by the estates' chapter 5 avoidance claims. As of the date of the confirmation hearing, the debtors owed $72 million to the Lenders on account of the Postpetition Loans. The debtors owed another approximate $70 million in addi-

tional administrative debt incurred during the chapter 11 cases, exclusive of professional fees which were funded by the Lenders through a carve out.

After operating in chapter 11 for a period of time, the debtors decided to liquidate. Their efforts proved to be disappointing. The debtors raised around $65 million through the sale of their "enterprise" companies, and used the proceeds to reduce the secured pre-petition debt. The debtors could not, however, sell their core assets. They eventually terminated their retail operations, and only their wholesale operations remain. Between the Petition Date and the confirmation hearing, their work staff shrunk from nearly 1500 employees to only 59.

As matters stood, the estates were administratively insolvent. The assets were insufficient to satisfy the Lenders' superpriority claims, and nothing was available for distribution to any other creditor, including the administrative and priority creditors. The debtors could not, therefore, satisfy § 1129(a)(9) which required, at a minimum, that the debtors "cash out" the administrative creditors on the effective date except to the extent that a particular administrative creditor agreed to different treatment.[1]

---

1. Section 1129(a)(9) requires that

> Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—
> (A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;
> (B) with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive—

> (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
> (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and
> (C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

## The Plan

Faced with the inevitable failure of the reorganization, the debtors, the Lenders and the Official Committee of Unsecured Creditors (the "Committee") sought a way to salvage it. Any plan would require a significant amount of negotiation and compromise. The Lenders would have to fund it because they were the only party with money. However, in light of the amount of administrative and priority debt, no realistic amount of funding would be enough to pay all of the administrative and priority debt in full. Thus, every administrative and priority creditor would have to agree to accept substantially less. Given the number of creditors, obtaining their consent would be time consuming and expensive, with no guarantee of success.

The "easy" part involved the matters that the debtors, Lenders and the Committee could control. Under the plan that was negotiated, the debtors would emerge from chapter 11 as Reorganized Teligent. Reorganized Teligent would continue to operate the debtors' remaining wholesale business, and employ 50 people. The Lenders would receive 100% of the equity in Reorganized Teligent in exchange for the Postpetition Loans and secured claims.

The money needed for distributions and other purposes would come from the Lenders. The Plan set up a Claim Fund of $4 million to pay the administrative and priority creditors. The Claim Fund was subject to adjustments, and by the time of the confirmation hearing, only $3.25 million was available for distribution. The Plan established classes for Administrative Convenience Claims and Priority Convenience Claims (collectively, the "Convenience Class") that included administrative and priority claims of $3,000.00 or less, as well as anyone with a larger administrative or priority claim who agreed to reduce his claim and opt into the Convenience Class.

Each holder of a Convenience Class claim would receive full payment on the Effective Date. The Plan distributed the balance of the Claim Fund on a *pro rata* basis to the remaining administrative, non-tax priority and tax priority debt. All three groups received the same treatment under the Plan, and they will be referred to collectively as the Administrative Creditors for the balance of this opinion.

Despite the debtors' administrative insolvency, the Plan also provided a potential distribution to the unsecured creditors. The Lenders agreed to assign their collateral—the chapter avoidance claims—to the Unsecured Claims Estate Representative. The Plan also assigned $300,000.00 to the Unsecured Claims Estate Representative to fund the investigation and prosecution of those claims.

The "hard" part involved obtaining the consent of the Administrative Creditors to different and less favorable treatment offered under the Plan. There were 2006 administrative and priority creditors. Approximately 75% held Convenience Class claims, and did not have to be solicited. The remaining 454 Administrative Creditors had to agree to accept the different treatment. Because so little was available for distribution, almost any one of the 454 could prevent confirmation merely by insisting on his right to full payment.

## The Consent Form

Pursuant to the Disclosure Statement, the debtors prepared a consent form (the "Consent Form") approved by the Court, and sent one to each Administrative Creditor. The Consent Form explained that the Bankruptcy Code required payment in full of administrative and priority claims for a plan to be approved unless the holder of an administrative or priority claim agreed to a different treatment of his claim. The Consent Forms further explained that there were insufficient funds to pay the

administrative and priority claims in full. Rather, the Administrative Creditors would receive between 5% and 12% if the Plan was confirmed. Unless the Administrative Creditors agreed to accept the different treatment proposed under the Plan, the debtors would have to withdraw the Plan and dismiss their cases, or convert them to chapter 7. Either way, the Administrative Creditors would probably not receive a distribution.

The Consent Form asked the Administrative Creditor to make an election from among three choices: (1) agree to accept the treatment under the Plan, *i.e.*, the *pro rata* share of the Claim Fund, (2) opt into the Convenience Class and accept the lesser of $3,000.00 or the allowed amount of the claim, or (3) decline to accept the treatment provided under the Plan. All the Administrative Creditor had to do was check the box next to his choice. The debtors urged each Administrative Creditor to accept the different treatment, and return the completed Consent Form. The Consent Form included a conspicuous notice that the debtors planned to ask the Court to rule that any Administrative Creditor who failed to return a Consent Form should be deemed to have agreed to accept the treatment under the Plan.

The debtors also simplified the procedure for communicating the election. The Consent Form indicated that it could be returned to the debtors either by: (a) mailing it in the self-addressed stamped envelope that had been provided; (b) faxing it to a toll free number listed on the Consent Form; or (c) e-mailing the election information to an e-mail address also provided on the Consent Form.

**The Solicitation Process**

The debtors caused the Consent Forms to be mailed on July 15, 2002 to all known Administrative Creditors. They had already notified the Administrative Creditors of the impending delivery of an important package requiring a time sensitive response, and followed up within a week after the Consent Forms were mailed. The Consent Forms indicated in bold, capital letters immediately above the election boxes that the deadline to return the Consent Forms to the debtors was 5:00 P.M., Prevailing Eastern Time, on August 7, 2002.

The debtors coordinated and maintained a Call Center that was staffed with seventeen customer service representatives and claim managers to answer any questions from administrative and priority creditors relating to the treatment of their claims under the Plan or the Consent Forms. The Consent Form listed a toll-free phone number that connected callers to a customer service center staffed between 7:30 a.m.—7:00 p.m., Monday through Friday. Calls received after 7:00 p.m. were directed to a stand-alone voice mailbox. Messages received in the voice mailbox were returned promptly the following morning. The debtors also initiated a targeted call campaign one week after the Consent Forms were mailed to "get out the vote." They contacted each Administrative Creditor to answer any questions, and urged him to return the Consent Form.

From July 16 through August 7 (the "Call Campaign Period"), the debtors' call center staff tracked all communications with the Administrative Creditors. Any communication with a creditor was treated as a single contact, regardless of whether the contact was the result of an incoming call to the Call Center or an outgoing call initiated by the Call Center staff. During the Call Campaign Period, the Call Center staff had an aggregate of 1214 contacts with creditors to discuss the Consent Forms and the treatment of administrative and priority claims under the Plan.

### Results of Consent Form Solicitation

As stated, the debtors sent out Consent Forms to the 454 Administrative Creditors. Eighty-five returned the form indicating that they agreed to accept the treatment under the Plan. Another 205 Administrative Creditors opted into the Convenience Class, effectively consenting to the alternative treatment offered under the Plan. Forty-nine Administrative Creditors settled their claims with the debtors pursuant to separate stipulations or agreements, and finally, eight Administrative Creditors returned the Consent Form electing not to agree with the treatment provided under the Plan. These objecting creditors subsequently changed their election to accept the treatment under the Plan. The face amount of the claims held by the Administrative Creditors who returned the Consent Form, including those that opted into the Convenience Class, aggregated nearly $48 million.

The remaining 107 Administrative Creditors did not return the Consent Forms. They represented an aggregate claim face value of approximately $4,529,270.00. The debtors made two attempts to contact 106 of these 107 creditors to answer questions and urge them to complete and return the Consent Form.[2] According to the proffer at the hearing, the debtors left voice mail messages with all 107, and eventually spoke to all but ten or eleven. In response to the inquiry regarding why they had not returned the Consent Form, between 60% and 70% stated, in substance, that they saw no reason to do so. They interpreted the Consent Form to say that if they did not return it, they would receive the same treatment as they would if they agreed to accept the treatment under the Plan. The remaining Administrative Creditors com-

plained of "Teligentitis," and wanted nothing further to do with the cases. *None of the 107 Administrative Creditors contacted during the follow-up advised the debtors that they objected to the different treatment proposed under the Plan.*

As of the confirmation hearing, the Convenience Class creditors were entitled to receive $2.25 million of the $3.25 million in the Claim Fund. This left $1 million. The debtors estimated that the claims of the 107 non-responding Administrative Creditors, after reconciliation, would exceed $2.1 million. If the debtors had to pay 100% of the allowed amount of these claims, they would not have been able to confirm the Plan.

### DISCUSSION

■ Section 1129(a)(9) of the Bankruptcy Code is a "default" provision. It requires administrative and priority creditors to be paid in full unless they agree to a different treatment of their claims. The issue presented in this case was whether it is appropriate to infer that agreement from the silent minority—the 107 creditors who did not bother to return the Consent Form or object either to the Consent Form procedures or the debtors' stated intention to ask the Court to treat their silence as consent.

The inquiry necessarily begins with the Bankruptcy Code. Section 1129(a)(9) says only that holders of administrative or priority claims must "agree" to different treatment, but it does not say how. While several courts have concluded that the virtually identical provisions of 11 U.S.C. § 1322(a)(2) governing chapter 13 plans

---

2. The debtors contacted the Wisconsin Department of Revenue, a priority creditor, only once. The creditor advised the debtors during the first (and only) contact that it would not return the Consent Form.

require an *express* consent,[3] *e.g., In re Northrup,* 141 B.R. 171, 173 (N.D.Iowa 1991); *In re Randolph,* 273 B.R. 914, 918 (Bankr.M.D.Fla.2002); *see In re Escobedo,* 169 B.R. 178, 179 (Bankr.N.D.Ind.1993) (priority claimants must "affirmatively agree" to different treatment), others have concluded that the creditor's agreement may, in appropriate circumstances, be implied from his conduct. *See, e.g., In re Trans World Airlines, Inc.,* Case no. 01–0056, *Transcript of Confirmation Hearing* at 12–13 (Bankr.D. Del. June 14, 2002)(construing § 1129(a)(9)); *In re Facciponte,* No. 92–01225, 1992 WL 722289, at *2 (Bankr.N.D.N.Y. Oct.7, 1992).

■ The latter view rests on firmer ground. While § 1129(a)(9) requires agreement, it does not state that the agreement must be express.[4] Courts should, therefore, "properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning'". *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership, et al.,* 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (quoting *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)).

The ordinary and common meaning of "agree" is "to grant consent; assent; to concede or grant," Webster's II New College Dictionary 23 (1999); *see also* American Heritage Dictionary of the English Language 36 (1996) ("to grant consent; accede"). "Consent" may be stated expressly, or implied from one's conduct

without any direct expression. *See* Black's Law Dictionary 300 (7th ed.1999). Congress's use of the word "agree" in section 1129(a)(9) of the Bankruptcy Code should be interpreted to include implied consent.

■ This conclusion is also consistent with general principles of contract law. As a rule, an offeror cannot treat silence or inaction as an acceptance. Restatement (Second) of Contracts § 69(1), at 164 (1981). Thus, he cannot ordinarily force the other party into a contract by saying "if I do not hear from you by next Tuesday, I shall assume you accept." John D. Calamari & Joseph M. Perillo the Law of Contracts § 2–18, at 83 (3d ed.1987). Nevertheless, there are exceptions to this rule, and two apply in this case. First, an offeree will be deemed to accept the offer through silence when he has a duty to speak. *Id.* Second, the offeree's silence may constitute acceptance where the offeror has stated his intention or given the offeree reason to understand that he will do so, "and the offeree in remaining silent and inactive intends to accept the offer." Restatement (Second) of Contracts § 69(1), at 164.

The first situation is a variation of the more general principle of estoppel through silence. An offeree's silence will be deemed to be an acceptance when he has a duty to speak. *See, e.g., Hughes v. John Hancock Mut. Life Ins. Co.,* 163 Misc. 31, 297 N.Y.S. 116, 120 (N.Y.Mun.Ct.1937). The duty to speak need not be purely legal, but may be based on principles of

---

**3.** Section 1322 states that
(a) The plan shall—
. . . .
(2) provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507 of this title, unless the holder of a particular claim agrees to a different treatment of such claim. . . .

**4.** In contrast, a class of claims "accepts" a plan only if the requisite majority of creditors within the class "accepts" it, 11 U.S.C. § 1126(c), and the Bankruptcy Rules clearly require an affirmative act to "accept." *See* Fed. R. Bankr.P. 3018(c).

ethics and good faith. *Columbia Broad. Sys. v. Stokely–Van Camp, Inc.*, 522 F.2d 369, 378 (2d Cir.1975)(discussing New York law of estoppel); *In re Ellison Assocs.*, 63 B.R. 756, 765 (S.D.N.Y.1983)(discussing estoppel by silence). Bankruptcies, in this regard, give rise to unique moral and ethical concerns because each creditor's action may affect the rights of every party in interest.

In bankruptcy, everyone's fate—the debtors, its employees and its creditors—is often intertwined and dependent on the success of a plan. While certain parties have the right to be paid in full, it is sometimes impossible to do so. The debtor has the right to ask each administrative and priority creditor to accept less, and such a creditor, who may hold the future of the case in his hands, should be under an obligation to speak up. This does not mean that he must accept the debtor's offer to take less, but only that he must respond to it. Otherwise, his silence could defeat the plan even though that was not his intention. Simply put, one's general right to remain silent in the face of an offer should be subject to question and reconsideration where passivity will threaten the fundamental goals of bankruptcy—rehabilitation, saving jobs and equality of distribution. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) ("The fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr.S.D.N.Y.1989) (acknowledging that "[t]he paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor").

The present situation presented a ready example of this principle. These cases were administratively insolvent. The Disclosure Statement and Consent Form advised the Administrative Creditors that the confirmation of the Plan hinged on their agreement to accept the treatment under the Plan, a prediction borne out by the actual events. Further, given the small amount available for distribution, almost any one of the 107 Administrative Creditors solicited by the debtors could prevent confirmation by refusing the different treatment and demanding payment in full.

Thus, the fate of the case and every party with a stake in the outcome depended on their assent, and they knew it. The same documents also advised them that the debtors intended to ask the Court to treat the failure to respond as an agreement to accept the different treatment. Given the circumstances, each Administrative Creditor who did not consent should have, in good conscience, communicated that fact to the debtors.

Equally important, the debtors provided a quick, easy and inexpensive way for each Administrative Creditor to make his election. He had only to check a box on the Consent Form, and mail it in a pre-addressed, stamped envelope, fax it to a toll free number, or e-mail the information to the address provided by the debtors. If the Administrative Creditor failed to respond for any reason, he received two telephonic contacts from the debtors reminding him to return the Consent Form. He did not have to hire an attorney or file a formal objection, and in light of the procedures established by the debtors, there was no danger that he would be lulled into silence.

Finally, if silence were not treated as consent, serious and possibly unintended consequences would follow. The Plan would be rendered unconfirmable. There was no other plan, and the case would have gone into a straight, chapter 7 liquidation.

In that event, the debtors could not reorganize around their existing business, the fifty people they intended to employ would not have jobs, the Lenders would get all of the assets, and no other creditor would receive a distribution. In short, it was reasonable and appropriate under the circumstances to require the Administrative Creditors to speak up, failing which they should be deemed to have accepted the debtors' offer of different treatment under the Plan.

Even in the absence of a duty to speak, the record made at the confirmation hearing supported the finding that the nonresponding creditors intended to accept the different treatment through their silence. The debtors told them that with the Court's permission, they intended to treat a non-response as a consent to different treatment. In that event, the failure to return the Consent Form would put the Administrative Creditor in the same position as if he had expressly agreed to accept the different treatment. Thus, an Administrative Creditor might have reason to believe that he could accept the different treatment simply by ignoring the Consent Form.

The evidence demonstrated that most Administrative Creditors did not return the Consent Forms for precisely this reason. Approximately two-thirds of the nonresponding Administrative Creditors advised the debtors, during the telephone follow-up, that they saw no purpose in returning the Consent Form because as they understood the documents, the result was the same whether they affirmatively accepted the proposed treatment or ignored the offer.

The balance said they were sick of Teligent, and wanted nothing further to do with the cases. Nevertheless, none expressed an objection to the proposed treatment, and their apathy did not imply any.

The documents they were sent advised them that absent their consent, the Plan could not be confirmed, and they would not receive a distribution. In the absence of any evidence that they disagreed with the proposed treatment, I do not presume that their failure to return the Consent Form indicated an intent to forego a distribution and cause the case to crater.

In conclusion, under the circumstances of this case, the failure to return the Consent Form implied agreement to the proposed treatment under the Plan within the meaning of 11 U.S.C. § 1129(a)(9). The foregoing shall constitute the Court's findings of fact and conclusions of law on this issue. *See* Fed.R.Civ.P. 52(a).