**In re TELIGENT, INC., Reorganized Debtor.**

**Savage & Associates, P.C., as Unsecured Estate Claim Representative, Plaintiff,**

v.

**A.I. Credit Corp., Defendant.**

**Bankruptcy No. 01–12974(SMB).**
**Adversary No. 03–3725.**

United States Bankruptcy Court,
S.D. New York.

Sept. 2, 2005.

Savage & Associates, P.C., Denise L. Savage, Michael K. Gertzer, of Counsel, White Plains, NY, for Plaintiff.

Zeichner Ellman & Krause LLP, Michael S. Davis, Anthony I. Giacobbe, Jr., of Counsel, New York City, for Defendant.

## OPINION GRANTING MOTION FOR SUMMARY JUDGMENT AND DENYING CROSS–MOTION TO PRECLUDE

STUART M. BERNSTEIN, Chief Judge.

The defendant in this preference action moved for summary judgment, contending

that it was fully secured at the time of each transfer. The plaintiff opposed the motion and cross-moved to preclude the defendant from offering certain evidence. For the reasons that follow, the motion is granted and the cross-motion is denied.

## BACKGROUND

### A. The Transactions

At all relevant times, Teligent, Inc. and its affiliates (collectively, "Teligent") were engaged in the business of providing telecommunications services to wholesale and retail customers. *In re Teligent, Inc.*, 282 B.R. 765, 766–67 (Bankr.S.D.N.Y.2002). In the course of its business, Teligent procured liability and other insurance policies. At times, it paid a portion of the premiums from its own funds, and borrowed the balance from a premium finance agency. At all relevant times, A.I. Credit Corp. ("AICCO"), the defendant, was engaged in the business of financing insurance premiums. (*Declaration of Joan Stratton*, dated Mar. 29, 2005, at ¶ 2)("*Stratton Declaration*")(ECF Doc. # 26.)

On or about November 28, 2000, Teligent purchased a group of D & O insurance policies at a total premium cost of $847,492.00. (*Id.*, Ex. A.) Teligent made a cash down payment of $254,247.60, or 30%, and financed the balance of the premium ($593,244.40) under an agreement with AICCO, dated November 28, 2000 (the "November Agreement"). (*See id.*, at ¶ 5 & Ex. A [1].) The November Agreement obligated Teligent to repay the loan from AICCO, plus a finance charge ($19,069.16), in nine monthly installments of $68,034.84 each, commencing on December 25, 2000. (*Id.*, at ¶ 5.)

---

**1.** Exhibit A to the *Stratton Declaration* is a     redacted copy of the November Agreement.

On or about December 11, 2000, Teligent purchased a second group of D & O insurance policies at a total premium cost of $165,900.63. (*Id.,* Ex. B.) This time, Teligent made a cash down payment of $40,562.50, or approximately 24%, and financed the balance of the premium ($125,338.13) under an agreement with AICCO, dated December 11, 2000 (the "December Agreement," and together with the November Agreement, the "Agreements"). (*See id.,* at ¶ 6 & Ex. B [2].) Teligent agreed to repay this second loan, plus a $4,028.86 finance charge, in nine monthly installments of $14,374.11 each, commencing December 25, 2000.[3] (*Id.,* at ¶ 6.) Thus, the monthly payments under the Agreements aggregated $82,408.95.

Each of the Agreements contained provisions pursuant to which Teligent assigned, *inter alia,* any unpaid premiums as security for the payments due under that Agreement. The front page of each Agreement included the following terms:

> **Security:** As security for the payments to be made under this Agreement, the insured is assigning to AICCO all unearned premiums, all dividends under the policies, and if the policy has a fully earned clause, all loss payments which reduce the unearned premiums.

Paragraph 4, on what appears to be the final page of each Agreement, stated:

> [The Insured] "[a]ssigns to AICCO as security for the total amount payable hereunder any and all unearned return premiums and dividends which may become payable under the policies listed in the schedule, and if the policy has a fully earned clause, loss payments under said policies which reduce the unearned premiums (subject, however, to any mortgagee or loss payee interests)."

Finally, Teligent appointed AICCO as its attorney-in-fact to cancel the premiums in the event of Teligent's default. Upon cancellation, AICCO was entitled to collect the unearned premiums, and credit the amount collected to the unpaid debt.

Following the execution and acceptance of the Agreements, AICCO notified the respective insurers of its security interest in the unearned premiums under the various D & O policies. (*Id.,* at ¶ 8 & Ex. C.)

At the time that the parties entered into the Agreements, Teligent already owed a substantial amount of secured debt. In 1998, Teligent had entered into a Credit Agreement with a consortium of lenders (the "Pre–Petition Lenders") under which it granted the Pre–Petition Lenders a security interest in all of its present and after-acquired assets.[4] The Pre–Petition Lenders duly filed various UCC Financing Statements in connection with their collateral in several states, including Virginia and New York.[5] Moreover, after Teligent filed for bankruptcy on May 21, 2001, the Court authorized Teligent to use the Pre–Petition Lenders' cash collateral, and granted the latter further protections, including replacement liens.[6]

---

**2.** Exhibit B to the *Stratton Declaration* is an incomplete copy of the December Agreement.

**3.** The December Agreement stated that the monthly payments were to commence on December 25, *2001.* This was plainly a typographical error. The loan was disbursed in December 2000, and the final payment was due, under the same December Agreement, on August 25, 2001.

**4.** A copy of the Credit Agreement is annexed to the Affidavit of Michael Gertzer, sworn to Apr. 22, 1995 ("*Gertzer Affidavit*") as Exhibit A.

**5.** Copies of the UCC Financing Statements are annexed to the *Gertzer Affidavit* as Exhibit B.

**6.** A copy of the final cash collateral order is annexed to the *Gertzer Affidavit* as Exhibit D.

## B.  The Transfers and this Litigation

Within the 90 day period prior to the filing of the chapter 11 petitions, Teligent made the following three payments (the "Transfers") to AICCO in connection with the Agreements (*see id.,* at ¶ 11):

| Date of Check | Amount |
|---|---|
| 02/23/01 | 82,408.95 |
| 03/23/01 | 82,408.95 |
| 04/19/01 | 412,044.75 |
| Total | 576,862.65 |

The plaintiff, who was authorized under Teligent's plan to prosecute avoidance actions, commenced this adversary proceeding on May 20, 2003, to recover the Transfers.  AICCO moved for summary judgment, contending that it was oversecured at the time of each payment.  Hence, the preference claim was barred.  The plaintiff's opposition primarily centered on the contention that AICCO's security interest in the unearned premiums was inferior to the interests of some or all of the Pre–Petition Lenders, rendering AICCO unsecured.  In addition, the plaintiff contended that AICCO failed to (1) include citations to evidence in its statement of undisputed facts as required by the Court's Local Rule 7056–1(e), (2) annex unredacted and complete copies of the Agreements to its motion papers, or (3) produce evidence (a) regarding the nature or existence of the underlying insurance policies, (b) the payment of premiums to the insurers, or (c) the value of its security at the time of each payment.  Finally, the plaintiff made a cross-motion to preclude AICCO from using evidence it allegedly failed to produce during discovery.

## DISCUSSION

### A.  Standards Governing Summary Judgment Motions

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by FED. R. BANKR.P. 7056, governs summary judgment motions.  A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).  The moving party bears the initial burden of showing that the undisputed facts entitle him to judgment as a matter of law.  *Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir.1995).

If the movant carries this initial burden, the nonmoving party must produce "substantial evidence" to defeat the motion, and the court must evaluate "the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–54, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmovant must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials. FED.R.CIV.P. 56(e).  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986);  *see Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548.  In deciding whether material factual issues exist, the Court must resolve all ambiguities and draw all *reasonable* inferences against the moving party.  *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

### B.  Insurance Premium Finance Agreements

An insurance premium finance agreement is essentially a loan collateralized by a purchase money security interest.  The insured makes a down payment, and funds the balance of the premium with an advance from the premium finance company. (*Reply Declaration of Joan Stratton,* dat-

ed May 5, 2005, at ¶ 2)("*Stratton Reply Declaration*")(ECF Doc # 33.) The entire premium is typically prepaid to the insurer, but is "earned" during the term covered by the insurance policy. (*See id.*, at ¶ 7.) If the policy is cancelled before the end of the term, the insurer must refund the unearned portion. (*Id.*)

The unearned premium serves as collateral for the premium financing loan. Typically, the insured executes a premium finance agreement agreeing to pay off the financed portion plus related finance charges in installments, (*id.*, at ¶ 2), assigns the unearned premiums to the premium financier as security for its obligations, (*id.*, at ¶ 4), and grants the premium financier a limited power of attorney to cancel the policies in the event of the insured's default. (*Id.*)

The Agreements conform to this typical pattern. In the plaintiff's view, they nevertheless raise two principal questions. Did AICCO perfect its lien, and was AICCO fully secured at the time of the Transfers?

## C. Perfection[7]

It is well-settled that Article 9 of the Uniform Commercial Code does *not* govern the perfection of the security interest in the unearned premiums. U.C.C. § 9–104(g) excludes the transfer of an interest or claim under an insurance policy (except for proceeds) from the coverage of Article 9. The coverage exclusion applies to unearned premiums. *In re Remcor, Inc.*, 186 B.R. 629, 635 (Bankr.W.D.Pa.1995)(collecting cases); *In re Braniff Int'l Airlines, Inc.*, 164 B.R. 820, 831 (Bankr.E.D.N.Y.1994)(discussing New York law), *aff'd in unpublished op.*, 101 F.3d 686 (2d Cir.1996); *Borg–Warner Credit Corp. v. RBS Indus., Inc. (In re RBS Indus., Inc.)*, 67 B.R. 946, 949–50 (Bankr.D.Conn.1986)(discussing New York law); *Nicola v. Northfield Ins. Co. (In re Redfeather Fast Freight, Inc.)*, 1 B.R. 446, 450 (Bankr.D.Neb.1979)(discussing New York law).

Rather, under both Virginia and New York law, perfection of a security interest in unearned premiums involves two steps: the execution of a security agreement and notice to the insurers of the premium financier's rights. *In re RBS Indus., Inc.*, 67 B.R. at 949–50 (construing New York law); Va.Code Ann. §§ 38.2–1801(c), 38.2–4712 (Michie 2004).[8] AICCO satisfied these two prerequisites. The Agreements included the usual assignments of unearned premiums, and the appointment of AICCO as Teligent's attorney-in-fact with the authority to cancel the policies if Teligent failed to pay the premium finance loan. In addition, AICCO supplied evidence, documentary and testimonial, that it gave notice of its rights to the D & O insurers. (*See Stratton Declaration*, at ¶ 8 & Ex. C.) The plaintiff did not produce any evidence to controvert AICCO's proof.

---

7. The parties suggest that either New York or Virginia law governs the issues in this case, but agree that the result will be the same regardless of which law controls.

8. Section 38.2–1801(c) provides that
   [W]here premiums for the issuance of a policy or endorsement have been financed by an insurance premium finance company and payment and evidence of financing for such policy or endorsement have been received by the insurer or its appointed agent, the insurer shall be liable for the return to the insurance premium finance company of any unearned premium due the insurance premium finance company.
   Section 38.2–4712 reinforces the absence of any necessity to file. It states:
   No filing of the premium finance agreement or recording of a premium finance transaction shall be necessary to validate the agreement as a secured transaction.

While the plaintiff agreed with AICCO up to a point, she contended that perfection also demanded that AICCO give notice to Teligent's pre-petition mortgagees, a step AICCO did not take. (*See Transcript of Hearing on Summary Judgment Motion*, held July 21, 2005, at 7)(ECF Doc. # 39.) Her argument was based on the language in paragraph 4 of the Agreements, quoted *supra*, which subordinated AICCO's rights in certain loss payments to, *inter alia*, Teligent's mortgagees. She reasoned that some or all of the Pre–Petition Lenders were "mortgagees," and were entitled to notice. Furthermore, she argued that the subordination language granted the Pre–Petition Lenders a superior claim to the unearned premiums. Because they were grossly undersecured, AICCO's lien was valueless.

■ The plaintiff's argument ignored the unambiguous language in the Agreements. Teligent's mortgagees had no rights in the unearned premiums; the subordination provision in paragraph 4 related only to loss payments. No evidence was offered to suggest that loss payments accrued under the policies. Moreover, the Pre–Petition Lenders' blanket liens did not cover the unearned premiums because, *inter alia*, their UCC filings did not perfect a security interest in the unearned premiums, and no evidence was offered to show that they took any other steps to perfect a security interest in the unearned premiums.

Accordingly, AICCO held a perfected security interest in the unearned premiums that was superior to the interests of Teligent's Pre–Petition Lenders, including its mortgagees.

## D. Was AICCO Oversecured?

■ Under 11 U.S.C. § 547(b)(5), the plaintiff in a preference action must show that the transferee received more as a result of the preference than if the preference was never paid, and instead, the transferee received a distribution on its claim in a hypothetical chapter 7 case.[9] Payments to an oversecured creditor are not preferential because the creditor would receive the full value of its collateral in a chapter 7 liquidation. *Ray v. City Bank & Trust Co. (In re C–L Cartage Co.)*, 899 F.2d 1490, 1493 (6th Cir.1990); *see Committee of Creditors Holding Unsecured Claims v. Koch Oil Co. (In re Powerine Oil Co.)*, 59 F.3d 969, 972 (9th Cir.1995), *cert. denied,* 516 U.S. 1140, 116 S.Ct. 973, 133 L.Ed.2d 893 (1996); 5 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 547.03[7], 547–46 to 547–47 (15th ed. rev.2005).

There are essentially two ways to value unearned premiums—the *pro rata* method and the short term method. Under the *pro rata* method, a proportionate amount of the premium is earned each day. *In re Waverly Textile Processing, Inc.*, 214 B.R. 476, 480 (Bankr.E.D.Va.1997); *In re Schwinn Bicycle Co.*, 200 B.R. 980, 983 (Bankr.N.D.Ill.1996); *see Van Valkenburgh v. Lenox Fire Ins. Co.*, 51 N.Y. 465, 1873 WL 9239, at *3 (1873) (computing the *pro rata* premium to be paid to the insured). Thus, if an annual policy costs

9. Section 547(b) provides, in pertinent part:
   Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
   . . . .
   (5) that enables such creditor to receive more than such creditor would receive if—
   (A) the case were a case under chapter 7 of this title;
   (B) the transfer had not been made; and
   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

$365, the insurer earns one dollar of the premium each day, and the unearned premium decreases in a corresponding amount. If the policy is cancelled after one month, $31 is earned (assuming a 31 day month) and the balance is unearned.

The short rate method accelerates the initial amount earned by adding a surcharge or "kicker" to the *pro rata* rate. Upon cancellation by the insured, the insurer is entitled to retain an amount of premium equal to the period of time that the policy was in effect, *plus* an amount representing the expenses incurred in taking the risk. 2 COUCH ON INSURANCE § 32:54 (3d ed.1995).

■ The amount of the unearned premium is governed by the insurance policy, 45 C.J.S. *Insurance* § 505 (1993), but is ultimately subject to state law. For example, New York law provides that when a premium insurance finance agency cancels the policy based on the insured's default, the insurer must return the unearned premiums computed on a *pro rata* basis, but may retain a minimum unearned premium of ten per cent of the gross premium or $60, whichever is greater. N.Y. BANKING LAW § 576(1)(f)(McKinney 2001).[10] According to AICCO, Virginia uses the short rate method to calculate premiums, and applies a rate of 10%.[11] (*Stratton Reply Declaration*, at ¶ 18.)

AICCO's oversecured position is intuitively clear, even without consideration of any specific calculations. The premiums under the Agreements aggregated $1,013,392.63. Teligent made a 30% down payment in connection with the November Agreement, which accounted for the bulk of the financing. It also made an approximate 24% down payment in connection with the December Agreement. Teligent borrowed $741,680.55 from AICCO to finance the balance of the premiums and the finance charges. Teligent's debt represented approximately 73% of the total value of the unearned premiums at the beginning of the policy period.[12] In essence, AICCO was in the same position as a mortgagee that lends up to 73% of the value of its collateral.

Furthermore, AICCO did not face the risk that the value of its collateral would drop at a faster rate than its debt, leaving it less secured or even undersecured. Teligent was required to pay off the premium finance debt by August 25, 2001, or before the end of the policy period. (*See Stratton Declaration*, Exs. A & B.) In other words, the debt shrank at a faster rate than the value of the unearned premiums. Accordingly, the amount of the unearned premiums would always exceed the amount of the debt, provided that Teligent paid the monthly installments on or before the due date.

AICCO's submissions confirmed these facts. The *Stratton Reply Declaration*, at ¶ 19, computed the unearned premium under the *pro rata* method—a straightforward mathematical calculation—and compared it to the debt. Teligent paid the monthly installments on time, and apparently prepaid the remaining installments with the final Transfer. The calculations showed that the value of the unearned premiums exceeded the total debt and the amount of each Transfer at the time of each Transfer.

The *Stratton Declaration*, at ¶ 13, made the same calculations using the short rate

---

10. Prior to 1992, the law permitted use of a short rate calculation.

11. Neither party referred to the law of any other jurisdiction.

12. All of the policies became effective on November 25, 2000. (*See Stratton Declaration*, Exs. A & B.)

method. Initially, the short rate method did not change the basic math; the same amount of premium was earned over the same one year period. Nevertheless, the short rate caused the premium to become earned at a non-uniform rate—a larger overall percentage was earned at the beginning, and since the aggregate premium did not change, a smaller overall percentage was earned at the end. A comparison of Stratton's calculations under the two methods reveals that AICCO's collateral was worth less under the short rate method at the time of each Transfer, but nonetheless exceeded the amount of the Transfer and the total debt at the time of each Transfer.

The plaintiff did not supply her own computations. Instead, she called Stratton's calculations self-serving, and argued that the unearned premium balance could not be computed without documentary information from each of the insurers relating to the unearned premiums. (*Plaintiff's Objection to A.I. Credit Corp.'s Motion for Summary Judgment and Cross Motion to Preclude,* dated Apr. 22, 2005, at 11 & n. 10)("*Plaintiff's Objection*") (ECF Doc. # 29.)

Her position lacked merit. As noted earlier, the calculation of the unearned premium as of any date involves simple math. One need only know the total amount of the premium, the effective date of the policy, the term of the policy, and the short rate, if any. Exhibits A and B attached to the *Stratton Declaration* included all but the last item, and the *Stratton Reply Declaration* supplied the short rate. Furthermore, AICCO's own records specified the amount of Teligent's unpaid debt on the date of each payment, and those amounts were reflected in Stratton's charts. Accordingly, AICCO could calculate its collateral position without any information from the insurer. As noted,

these calculations confirmed its oversecured position at the time of each Transfer.

### E. The Plaintiff's Other Arguments

The plaintiff's remaining points merit only brief comment.

1. Although AICCO's original statement of undisputed facts inadvertently omitted citations to the record, (*see Reply Declaration of Anthony I. Giacobbe, Jr.,* dated May 6, 2005, at ¶ 5)("*Giacobbe Declaration*")(ECF Doc. # 32), AICCO provided the citations in a supplemental statement. (*See A.I. Credit Corp.'s Supplemental Statement of Uncontested Material Facts In Support of Its Motion for Summary Judgment Pursuant to Local Bankruptcy Rule 7056–1,* dated May 6, 2005)(ECF Doc. # 34.) The plaintiff failed to show that she suffered prejudice, and AICCO's initial omission does not support a denial of the motion.

2. While it is true that AICCO did not produce the insurance policies, it said it did not have copies, and had no contractual right to obtain them. (*Stratton Reply Declaration,* at ¶ 6.) Furthermore, Teligent, the plaintiff's predecessor, presumably has copies, and if not, can obtain copies from the insurer. (*Id.*) Finally, the contents of the policies are immaterial to the issues raised by the motion.

3. AICCO redacted the irrelevant portions of the policy schedules that were attached to the premium finance agreements and submitted with its motion. (*See id.,* at ¶ 27.) It produced unredacted copies during discovery. (*Id.*) The plaintiff never showed that the redactions omitted material information.

4. Finally, AICCO provided sufficient evidence that the insurers actually received the premiums that formed the basis of its collateral. Typically, the insured's down payment and the premium loan fully prepay the entire premium. (*Id.,* at ¶ 2.)

The financial records produced by AICCO showed that it loaned $593,244.40 to Teligent on December 5, 2000, and $125,338.13 on December 18, 2000. (*See Stratton Declaration*, Ex. D.) These advances satisfied its lending obligations under the Agreements.

The premium finance lender does not pay the insurer directly, but instead, advances the loan to the agent or broker that procured the insurance who, in turn, pays the insurer. (*Stratton Reply Declaration*, at ¶ 5.) Here, AICCO advanced the loans to Armfield, Harrison & Thomas, Inc., the insurance producer that signed the Agreements. (*See id.*, at ¶¶ 5–6.) Although AICCO did not supply direct evidence that the producer remitted the financed portion of the premiums to the insurers, it is the only inference that the record supports. The plaintiff does not argue that the policies were never issued, or that they were cancelled during their terms. It defies credulity to suggest that the producer did not remit the balance of the premiums but the insurers nevertheless issued the policies and kept them in force. The plaintiff did not submit any evidence to rebut this inference, or to suggest that the premiums were not paid in full to the insurers in the typical manner.

Accordingly, AICCO demonstrated as a matter of law that it held a perfected security interest in the unearned premiums at the time of each payment, and was oversecured. Consequently, the plaintiff cannot satisfy 11 U.S.C. § 547(b)(5), and AICCO is entitled to summary judgment dismissing the complaint.

## F. The Plaintiff's Cross–Motion

■ The Plaintiff cross-moved to preclude AICCO from using any documents not produced in discovery, including the insurance policies, evidence that AICCO paid the insurers, or the value of the unearned premiums at the time of each transfer. (*Plaintiff's Objection*, at 17–18.) The cross-motion leaves me "amused to the point of befuddlement." *Official Committee of Unsecured Creditors v. McConnell (In re Grumman Olson Indus., Inc.)*, 329 B.R. 411, 435 (Bankr.S.D.N.Y.2005) (quoting *Carlile v. Continental Airlines, Inc.*, 953 F.Supp. 169, 171 (S.D.Tex.1997)). By letter dated January 16, 2004, counsel for AICCO wrote to the plaintiff's attorney in an attempt to convince her that the proceeding lacked merit and the complaint should be dismissed. (*See Giacobbe Declaration*, Ex. A.) The letter also suggested that a deposition of AICCO was unnecessary as the facts were undisputed:

Finally, as discussed with Mr. Gertzer [plaintiff's counsel], we hope that the deposition notice will become moot. In the event you will not consent to withdraw the action, such deposition is unnecessary because there are no factual issues in dispute. The premium finance agreements are contracts and contain the terms of the agreements. The dates and amounts of payments made pursuant to those contracts are likewise not disputed. No other facts are relevant to this issue of law.

Gertzer, the plaintiff's attorney, responded on January 30, 2004. (*See id.*, Ex B.) Although the plaintiff declined to withdraw the complaint, he stated:

[W]e concur that the only issues herein are questions of law, not fact. Therefore, we will not need to take the defendant's deposition.

Although the Court is not bound by the parties' view that no disputed facts exist, *cf. Heyman v. Commerce & Indus. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)("The well-settled rule is that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed."), it is

nonetheless true that Gertzer declined to take AICCO's deposition based on his expressed view that the case did not present any factual disputes. Furthermore, his only request in the January 30th letter was for a more legible copy of the finance agreement (the copies attached to the motions are legible) and information regarding whether AICCO cancelled the insurance policies (which neither side contends it did). Gertzer did not ask for or need copies of the insurance policies, evidence that the premiums were paid to the insurers or information regarding the calculation of the unpaid premiums. Under the circumstances, the preclusion motion borders on the frivolous, and is denied.

## CONCLUSION

AICCO is directed to settle an order that (1) grants its motion for summary judgment, (2) denies the cross-motion to preclude, and (3) directs the Clerk of the Court to enter a final judgment dismissing the adversary proceeding.