**IN RE: MOLYCORP, INC., Reorganized Debtor.**

**Case No.: 15–11357 (CSS) (Jointly Administered)**

United States Bankruptcy Court, D. Delaware.

Signed January 5, 2017

MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Robert J. Dehney, Gregory W. Werkheiser, Andrew R. Remming, 1201 North Market Street, 16th Floor, Wilmington, DE 19899 and MILBANK TWEED, HADLEY & McCLOY LLP, Dennis F. Dunne, Samuel A Khalil, Lauren C. Doyle, 28 Liberty Street, New York, NY 10005, and Andrew M. Leblanc, Aaron L Renenger, 1850 K Street NW, Suite 1100, Washington, DC 20006, Counsel for OCM MLY-Co CTB Ltd.

ASHBY & GEDDES, P.A., William P. Bowden, Gregory A. Taylor, 500 Delaware Avenue, 8th Floor, P.O. Box 1150, Wilmington, DE 19899 and PAUL HASTINGS LLP, Luc A. Despins, Andrew V. Tenzer, 200 Park Avenue, New York, NY 10166, Co–Counsel for the Official Committee Of Unsecured Creditors

## OPINION[1]

Sontchi, J.

## INTRODUCTION

The Debtors in this case sought an order confirming their joint Chapter 11 plan of reorganization following an execution of a global settlement agreement among the Debtors, the lender, and the Official Committee of Unsecured Creditors.[2] The Court conducted a confirmation hearing, and based upon the evidence presented con-

---

1. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, which is applicable to this matter by virtue of Fed. R. Bankr. P. 9014.

2. D.I. 1302.

firmed the plan.[3] Ordinarily, this would end the matter in a consensual way. However, the lender filed an objection to the Committee's Counsel's request for compensation and reimbursement of expenses. At large, the lender asserts that the compensation requested was incurred in violation of a dollar-amount cap included in the DIP Financing Order. In contrast, the Committee's Counsel argues that the cap in the DIP Financing Order has no implication after the reorganization plan has been confirmed. For the reasons set forth below, the Court will overrule the lender's objections and will approve the Committee's Counsel's fee application. The Court holds that absent specific language not found in the DIP Financing Order at issue here, a dollar-amount cap on professionals' fee payment, or a carve-out, does not come into play once a Chapter 11 plan is confirmed. That is because a fundamental statutory requirement of the Bankruptcy Code is that, unless the holder of a particular claim has agreed to a different treatment, allowed professionals' fees are administrative expenses that need to be paid in full under any confirmed plan. Additionally, the Court is satisfied that the Fee Examiner's recommendations reflect reasonable compensation for actual and necessary services.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. In addition, this Court expressly retained jurisdiction pursuant to the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals.[4] Venue is proper in this District pursuant to 28 U.S.C. § 1409(a). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (B) as relief is predicated on 11 U.S.C §§ 330 and 331. The Court has the judicial power to enter a final order.

## STATEMENT OF FACTS

### A. Factual and Procedural Background

On June 25, 2015, Molycorp, Inc. and certain of its direct and indirect subsidiaries (collectively, the "Debtors") filed voluntary petitions under Chapter 11 of the Bankruptcy Code. The cases have been jointly administrated.[5] Following the filing, the Debtors engaged in a series of intense negotiations in an attempt to obtain postpetition financing that would provide the Debtors with the liquidity they needed to continue to operate their business.[6] Ultimately, the Debtors entered into a DIP financing facility with Oaktree Capital Management, L.P. ("Oaktree"). As a result, on July 1, 2015, the Debtors filed a motion for approval of financing and use of cash collateral (the "DIP Financing Motion").[7] An interim order pursuant to the

---

3. D.I. 1580.

4. D.I. 229.

5. On April 13, 2016, the Court entered an order amending the joint administration order. Case No. 15–11371, D.I. 8. Certain of the Debtors known colloquially as the "Neo Debtors" reorganized and their cases continue to be jointly administered under Case No. 15–11357. Certain other Debtors known as the "Mineral Debtors" have not been reorganized and are under the control of a Chapter 11 trustee. The Mineral Debtors' cases are jointly administered under Case No. 15–11371. The bifurcation of joint administration has no effect on the issues before the Court.

6. The background is relatively complex, and, except as necessary to frame the issues in this matter, will not be set forth. For a broader description of the Debtors' attempts to obtain post-petition financing see D.I. 109 ¶¶ 1–8.

7. D.I. 109.

DIP Financing Motion was entered on July 2, 2015.[8] A final hearing was held on July 22, 2015, and on July 24, 2015, the Court entered its final order approving the DIP Financing Motion (the "DIP Financing Order").[9] In between, the Official Committee of Unsecured Creditors was formed (the "Committee"),[10] and selected Paul Hastings LLP (the "Committee's Counsel" or "Paul Hastings") as its lead counsel.[11] Almost three weeks after entry of the DIP Financing Order, on August 13, 2015, the Court approved Paul Hastings' retention by the Committee.[12]

Soon after its formation, the Committee launched an investigation into potential claims that could be asserted by the Debtors. The Committee's investigation spanned over four months and involved extensive discovery process. As a result of its investigation, on December 23, 2015, the Committee filed a motion seeking standing to pursue certain causes of actions against Oaktree and the Debtors' directors and officers (the "Standing Motion"). On January 14, 2016, the Court entered an order authorizing the Committee to bring litigation on behalf of the Debtors' estate pursuant to the Standing Motion,[13] and, on January 15, 2016, the Committee commenced an adversary proceeding and filed its complaint.[14] Meanwhile, the parties participated in an extensive mediation before the Honorable Robert D. Drain of the United States Bankruptcy Court for the Southern District of New York.[15] Due to Judge Drain's tireless efforts and the parties' good faith negotiations, the mediation ultimately bore fruit and, on February 22, 2016, the Debtors filed a notice of execution of a global settlement agreement between different parties to this case, including between the Committee and Oaktree (the "Settlement Agreement").[16] The Settlement Agreement paved the way for a consensual reorganization plan for certain of the Debtors.[17] On March 29–30, 2016, the Court held a hearing to consider confirmation of the reorganization plan.[18] After receiving documentary and testimonial evidence, the Court approved the plan on April 8, 2016 (the "Confirmation Order" and the "Confirmed Plan" respectively).[19]

8. D.I. 130.

9. D.I. 278.

10. On July 8, 2015, the United States Trustee for the District of Delaware appointed the Committee pursuant to section 1102(a) of the Bankruptcy Code, D.I. 152. On July 22, 2015, the United States Trustee submitted an amended notice of appointment of the Committee, D.I. 264.

11. At an organizational meeting of creditors held on July 8, 2015, the Committee selected Paul Hastings as its lead counsel, pursuant to section 1103 of the Bankruptcy Code, see D.I. 296, ¶ 4.

12. D.I. 369.

13. D.I. 1086.

14. D.I. 1101; Adv. Proc. No.: 16–50005 (CSS).

15. D.I. 849.

16. D.I. 1302.

17. That is, the "Neo Debtors." See n. 5, supra.

18. On April 5, 2016, and then again in April 8, 2016, the Debtors filed a revised proposed confirmation order consistent with the Court's ruling on the record at the confirmation hearing and further comments from parties in interest, see D.I. 1556 and 1576 respectively.

19. D.I. 1580. Subsequently, on May 2, 2016, the Court approved the Joint Motion of the Debtors and the Committee for Approval of Technical Modifications to the Confirmed Plan, D.I. 1663.

## B. Paul Hastings' Second Interim Fee Application and Oaktree's Objection

In its Second Interim Fee Application, Paul Hastings seeks approval of fees in the amount of $8,491,064.75 and reimbursement of expenses in the amount of $226,170.96, for the period from September 1, 2015, through March 31, 2016 (the "Second Interim Application").[20] Oaktree objects to the compensation requested on the grounds that the fees sought in the Second Interim Application are excessive, unreasonable, and were incurred in direct violation of the DIP Financing Order.[21] Specifically, Oaktree asserts that the dollar-amount cap set in the DIP Financing Order, with regard to the Committee's investigation into potential claims, constitutes an absolute cap on fee payments out of certain sources enumerated in the DIP Financing Order (i.e., the DIP loans, the prepetition Oaktree collateral, the DIP collateral, or any portion of the carve-out (the "Restricted Sources")).[22] Oaktree argues that the Committee has long ago exhausted the dollar-amount cap in the DIP Financing Order, and that Paul Hasting has not identified, and cannot identify, any source of payment other than the Restricted Sources for the fees sought; that is, since the Restricted Sources account for substantially all of the Debtors' sources of cash.[23] In other words, Oaktree contends that there is no money left to be dispersed without rendering meaningless the cap in the DIP Financing Order.

Oaktree also maintains that the Second Interim Application conflicts with the DIP Financing Order for another, separate reason. Oaktree argues that, although the DIP Financing Order allows for limited payments out of the Restricted Sources for investigating potential claims, it does not authorize any compensation for the initiation and prosecution of such claims. According to Oaktree, a significant portion of the fees requested by Paul Hastings in the Second Interim Application should be denied because it relates to the initiation and prosecution of claims against Oaktree rather than to the Committee's investigation. Thus, the argument goes, even if an alternative source of payment could be identified, the payment of such fees must be denied as strictly prohibited under the DIP Financing Order.[24]

Furthermore, Oaktree asserts that not only does the Second Interim Application conflict with the DIP Financing Order, but that it also fails to pass the reasonableness test under section 330(a) of the

---

20. D.I. 1760. The Second Interim Application requests compensation for services rendered and reimbursement of expenses for the period from October 1, 2015 through March 31, 2016. Additionally, the Second Interim Application includes a request for compensation and reimbursement for the period of September 1, 2015 through September 30, 2015, which had not previously been requested in this case. The Second Interim Application was submitted pursuant to the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, D.I. 229.

21. Oaktree's Objection to the Second Interim Application, D.I. 1800. This Objection incorporated by reference Oaktree's Objection to

Paul Hastings Fee Application for the Period from September 1, 2015, through September 30, 2015, and Oaktree's Objection to Paul Hastings Fee Application for the Period from December 1, 2015, through December 31, 2015. Oaktree has reiterated the same arguments in its other objections to Paul Hastings' monthly fee applications between September 2015 and February 2016.

22. *Id.* at ¶ 3.

23. *See* Oaktree's Objection to Paul Hastings Fee Application for the Period from September 1, 2015, through September 30, 2015, ¶¶ 3–4, 25, D.I. 1174.

24. *See id.* at ¶¶ 27–29.

Bankruptcy Code.[25] Oaktree advances that the dollar-amount cap in the DIP Financing Order represents the reasonable compensation standard for the Committee's professionals' services. Put another way, Oaktree claims that any portion of Paul Hastings' fees that exceeds the cap set by the DIP Financing Order is presumptively unreasonable.[26] Finally, Oaktree asserts that the descriptions of work performed by Paul Hastings' attorneys are excessively vague. Accordingly, Oaktree believes that Paul Hastings has not met its burden with respect to these vague time entries, and allowance or payment of any fees associated with these entries should be denied.[27]

Paul Hastings rejects Oaktree objections. Paul Hastings maintains that a carve-out in a DIP order simply provides that a professional gets a right, that he or she otherwise would not had, to use a portion of the secured creditor's collateral for payment of such professional's fees. While this may be relevant in an administratively insolvent case, the argument goes, it is irrelevant in a case such as this with a confirmed Chapter 11 plan. In other words, Paul Hastings argues that the dollar-amount cap for using Oaktree's collateral has no impact whether the requested fees should be allowed, and, to the extent they are allowed, they remain entitled to payment as administrative expense claims if the Debtors wish to have a plan of reorganization confirmed.[28] Additionally, Paul Hastings asserts that the Committee and its professionals have worked diligently and efficiently, consistent with the Committee's fiduciary duties to the unsecured creditors, to maximize the value of the Debtors' estates. Paul Hastings argues that its investigation and litigation efforts, which led, in part, to the Settlement Agreement, resulted in significant value to the unsecure creditors that they would otherwise not have received. The matter is now fully briefed and is ripe for the Court's consideration.[29]

## DISCUSSION

Although the DIP Financing Order contains many provisions, this case centers on but one. Paragraph 4(b) of the DIP Financing Order provides an exception to the prohibition against the use of the Restricted Sources as follows:

> Notwithstanding the foregoing, up to $250,000.00 in the aggregate proceeds of the DIP Loans, the DIP Collateral, the Prepetition Collateral, and the Carve-Out may be used to pay fees and expenses of the professionals retained by the Committee that are incurred in connection with investigating (but not prosecuting any challenge to) the matters covered by the stipulations contained in Paragraphs I and J of this Final Order.[30]

25. *See id.* at ¶ 33; 11 U.S.C. § 330(a)(1) (2012).

26. *See* Oaktree's Objection to Paul Hastings Fee Application for the Period from December 1, 2015, through December 31, 2015, ¶ 8, D.I. 1686.

27. *See* Oaktree's Objection to Paul Hastings Fee Application for the Period from September 1, 2015, through September 30, 2015, ¶¶ 30–31, D.I. 1174.

28. *See* Paul Hastings' Omnibus Response to Oaktree's Objection to the Second Interim Application, ¶¶ 7–9, D.I. 1804.

29. The Court heard arguments on the Second Interim Application and Oaktree's Objection on July 26, 2016, and at the conclusion of the hearing took the matter under advisement (the "Hearing").

30. Paragraph I of the DIP Financing Order contains stipulations and admissions made by the Debtors as to the amount and enforceability of the prepetition Oaktree obligations, and

As set forth above, the parties offer different implications to the dollar-amount cap in paragraph 4(b) of the DIP Financing Order. These two opposite approaches lead to one fundamental question the Court has to answer: what does the dollar-amount cap in the DIP Financing Order mean? Specifically, does the DIP Financing Order set an absolute limit on fees incurred by the Committee's professionals? If the Court concludes that the limitation in the DIP Financing Order represents an absolute cap then that would virtually end the matter.[31] However, if the Court decides that the DIP Financing Order does not include a *per se* limit on what could be allowed as administrative expenses, it must proceed further and determine if the fees requested by the Committee's Counsel satisfy the requirements of section 330(a) and 331 of the Bankruptcy Code.

## A. Application of a Cap on Professionals' Fees in a DIP Financing Order

 Payment of professionals' fees in Chapter 11 cases is a favored object of the Bankruptcy Code, but it is no more favored than protecting the rights of creditors with secured claims. As a general

rule, administrative expenses must be satisfied from assets of the estate not subject to liens.[32] A secured creditor's interest in its collateral is a substantive property right created by non-bankruptcy law, which may not be substantially impaired when bankruptcy intervenes.[33] A secured creditor should not be deprived of the benefit of its bargain and will be protected in bankruptcy to the extent of the value of its collateral; furthermore, only surplus proceeds are available for distribution to other creditors of the estate and administrative claimants. Therefore, absent equity in the collateral, administrative claimants cannot look to encumbered property to provide a source of payment for their claims.[34]

 The bankruptcy court's discretion to permit payment of administrative expenses is restricted by the existence of unencumbered assets that exceed any super-priority claims. While professionals' fees allowed under sections 330(a) and 331 enjoy a certain preeminence under the Bankruptcy Code, their payment must be consistent with the Code's overall scheme of priorities.[35] Thus, as a matter of course,

---

as to the priority, validity, enforceability, and extent of the prepetition Oaktree liens. Paragraph J of the DIP Financing Order contains the Debtor's stipulations regarding adequate protection obligations, including Oaktree's entitlement.

**31.** Paul Hastings has suggested alternative arguments in support of the Second Interim Application. Specifically, Paul Hastings asserted that it is entitled to the payment of its allowed fees from certain Debtors that were not obligors under the DIP facility. Paul Hastings also argued that the Confirmed Plan and the Settlement Agreement contain mutual releases that, among other things, waive Oaktree's right to object to Paul Hastings' fee applications. In light of the Court's holding that the cap in the DIP Financing Order was not intended to come into play following a confirmation of a reorganization plan, the

Court finds it unnecessary to consider Paul Hastings' alternative arguments.

**32.** *In re American Resources Management Corp.*, 51 B.R. 713, 719 (Bankr. D. Utah 1985).

**33.** *Id.; see also Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935).

**34.** *In re American Resources*, 51 B.R. at 719.

**35.** 11 U.S.C. §§ 503(b)(2), 507(a)(2) and 507(b) (2012); *see also In re Roamer Linen Supply, Inc.*, 30 B.R. 932, 935 (1983) ("[a]n attorney who is authorized by the court to represent a debtor in a case under the Bankruptcy Code is not a creditor of the estate; such attorney's compensation is governed by the standards expressed in § 330(a)").

"[p]ost-petition attorneys' and accountants' fees are administrative expenses and may not be given priority over existing liens and super-priority claims."[36] In other words, where there are insufficient unencumbered assets with which to pay administrative expenses, professionals employed by the debtor or by creditors' committees may not ordinarily look to secured creditors' collateral for payment.

Indeed, "[i]n every case there is the uncertainty that the estate will have sufficient property to pay administrative expenses in full."[37] Those holding administrative claims may run the risk of nonpayment or partial payment whenever there is an adequate protection shortfall under section 507(b), supper-priority borrowing under section 364, or conversion of the case and subordination of Chapter 11 administrative expenses under section 726(b) of the Bankruptcy Code.[38] These risks are well known to experienced bankruptcy practitioners, such as the attorneys for the Committee in this case. To deal with some of the abovementioned risks, professionals usually negotiate a carve-out to provide for the payment of their allowed fees. In other words, the effect of a carve-out is to allow affected professionals to look to the secured creditor's collateral where otherwise they would not be able to do so. The carve-out is essentially an agreement by the secured creditor to subordinate its liens and claims to certain allowed administrative expenses, permitting such professionals' fees to come first in terms of payment from the estate's assets.[39] In fact, "a secured creditor may, without doing violence to the letter or spirit of the Bankruptcy Code, selectively waive its liens and super-priority claims to permit payment of certain administrative expenses but not others."[40] The carve-out may be subject to a dollar-amount cap and also to restrictions on the services that can be paid out of the carve-out (usually, the agreement, as demonstrated here, would preclude the use of the carve-out to sue the secured creditor who agreed to it). And, only to close the loop, it should be noted that when there are insufficient unencumbered assets to pay professionals' fees and no plan has been confirmed, professionals' only recourse is the carve-out. In such cases the "secured creditor's consent to the payment of designated expenses limited in amount will not be read as a blanket consent to being charged with additional administrative expenses not included in the consent agreement."[41]

36. *In re American Resources*, 51 B.R. at 719; *see also In re Roamer Linen Supply* (discussing, *inter alia*, the possibility of subordinating part of the secured creditor's collateral to specific costs and administrative expenses incurred during efforts to enhance or protect the secured position, and the possibility of subordinating the secured creditor's collateral under the equitable subordination doctrine).

37. 124 Cong. Rec. H32395 (daily ed. Sep. 28, 1978) (statement of Rep. Edwards).

38. *In re American Resources*, 51 B.R. at 721.

39. As a practical matter, the secured creditor usually agrees to the carve-out because otherwise nobody will represent the debtor or the committee and the case will fall apart, further diminishing the overall value of the secured creditor's collateral; *see* 3 *Collier on Bankruptcy*, ¶ 331.02[5][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016) ("[n]aturally, if the secured creditor does not consent and cash collateral will not be available to pay professional fees in a chapter 11 case, the case will not long survive in chapter 11 and will either be dismissed or converted to chapter 7").

40. *In re American Resources*, 51 B.R. at 722.

41. *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985).

█ In the present case, paragraph 4(b) of the DIP Financing Order reflects Oaktree's consent to payment of certain administrative expenses and imposes a limit on the amount of its collateral which may be used to pay the attorneys employed by the Committee (up to an aggregate sum of $250,000). As a consequence, in the event that a plan was not confirmed and the estate had become insolvent, the dollar-amount cap would have resulted in Paul Hastings not being compensated for all the work it has performed. That was a risk the Committee's Counsel consciously took.[42] Thus, it is unclear why Oaktree believes that paragraph 4 of the DIP Financing Order has no meaning unless the dollar-amount cap acts as a complete bar on the allowance of Paul Hastings' fees.[43] As explained above, the DIP Financing Order capped Oaktree's exposure and liability to payment of certain administrative expenses in case no reorganization plan had been executed.[44] However, as things turned out, the Debtors were successful in their efforts to work out a plan and have it confirmed.

## B. The Effect of a Confirmed Reorganization Plan on Administrative Expenses Payment

█ The Bankruptcy Code requires that in order to confirm a reorganization plan the court must satisfy itself that the plan meets all the requirements of Chapter 11.[45] For our purposes, section 1129(a)(9) of the Bankruptcy Code provides for the mandatory treatment of certain claims entitled to priority. Specifically, section 1129(a)(9)(A) of the Bankruptcy Code requires that, unless agreed otherwise, each holder of an administrative claim will receive cash equal to the allowed amount of such claim on the effective date of the plan;[46] this is true regardless to the existence of unencumbered assets.[47] Put differently, "[t]he Code's confirmation scheme elevates allowed administrative claims to a dominant priority such that unless the holders agree to a different treatment, a plan cannot be confirmed without full payment of those claims even if there are no estate assets to pay

---

**42.** *See* Transcript of Hearing (July 26, 2016) ("Hr'g Tr.") 10:9–12; 10:25, 11:1–3. Counsel for Oaktree argued during the Hearing that if Paul Hastings knew that the dollar-amount cap was not going to come into play in case a plan is confirmed, then Paul Hastings had have no incentive to limit what it spends, *see* Hr'g Tr. 56:1–5. As mentioned above, this view completely disregards the risk undertaken by Paul Hastings that no plan would be confirmed and that the estate would become insolvent.

**43.** *See* Oaktree's Sur–Reply to the Omnibus Response of Paul Hastings, ¶¶ 14 and 16, D.I. 1848.

**44.** Section 4(b) of DIP Financing Order distinguishes between the Committee's investigation and the prosecution of certain claims. This distinction simply makes it clear that the right being given to the Committee to proceed against Oaktree's collateral does not apply to the initiation and prosecution of claims.

**45.** 11 U.S.C. § 1129(a) (2012).

**46.** *See In re Hechinger Inv. Co. of Delaware*, 298 F.3d 219, 224 (3d Cir. 2002) ("[i]n a Chapter 11 case, a court cannot confirm a distribution plan unless the plan provides full cash payment of all § 503(b) administrative expense claims or the claim holder agrees to different treatment"); *In re American Home Mortg. Holdings, Inc.*, 411 B.R. 169, 175 (Bankr. D. Del. 2008) ("section [1129(a)(9)(A)] requires Chapter 11 plan proponents to demonstrate that the holders of administrative expense claims will be cashed out on the effective date of the plan or that the claims will be otherwise resolved on terms acceptable to the holder of the claim").

**47.** *See, e.g., In re Aleris Intern, Inc.*, No. 09–10478, 2010 WL 3492664, at *25 (Bankr. D. Del. May 13, 2010).

them."[48] Moreover, "if the secured parties desire confirmation, the administration claims must be paid in full in cash at confirmation even it if means invading their collateral."[49] The flip side of this requirement is that each administrative or priority creditor may hold the future of the case in its hands. "In bankruptcy, everyone's fate—the debtors, its employees and its creditors—is often intertwined and dependent on the success of the plan. While certain parties have the right to be paid in full, it is sometimes impossible to do so."[50] Professor Douglas G. Baird well explains:

> After the votes are received, the debtor can ask the court to approve the reorganization plan. The court must satisfy itself that the plan meets all the requirements of Chapter 11. Many are spelled in § 1129(a). The plan must, for example, pay off administrative expense claims in cash. § 1129(a)(9)(A). This requirement may be burdensome for businesses that lack ready access to capital markets ... [However,] [p]ractices have emerged that make this requirement less rigid than it might first appear.

Administrative creditors are free to scale back or modify their claims in a side deal. Their willingness to do so depends on their past and future relationship with the debtor. For example, among the largest administrative claims may be payments owed to the debtor's counsel, and these are often structured with a schedule over time.[51]

The practices to which Professor Baird points where those who hold administrative expense claims agree to take another deal, rely on the exception set out in the preamble to section 1129(a)(9); that is, if "the holder of a particular claim had agreed to a different treatment of such claim."[52] In other words, in the context of a plan confirmation, a cap on the amount to be paid towards administrative expenses may only be approved after obtaining the administrative claimants' consent.[53] Yet, while the Bankruptcy Code requires an agreement, it does not state the form which a consent to a different treatment must be given, nor does it indicate the time or stage in a Chapter 11 case that such consent may be obtained.[54]

---

48. *In re Scott Cable Communications, Inc.,* 227 B.R. 596, 600 (Bankr. D. Conn. 1998); *see also Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 508 (S.D.N.Y. 1994) (referring to section 1129(a)(9)(A) as the "administrative solvency" requirement, which is "the ability of the [debtor's] estate to satisfy administrative claims at the confirmation hearing").

49. *In re Emons Industries, Inc.,* 76 B.R. 59, 60 (Bankr. S.D.N.Y. 1987).

50. *In re Teligent, Inc.,* 282 B.R. 765, 772 (Bankr. S.D.N.Y. 2002).

51. Douglas G. Baird, *Elements of Bankruptcy* 240–241 (6th ed. 2014); similarly, Paul Hastings' counsel also suggested that in most cases disputes over professionals' fees get resolved by the parties through a consensual resolution or through an agreement on a quantum of value that will be distributed to unsecured creditors, which include payment

for professionals' fees, *see* Hr'g Tr. 51:19–25; 52:11–20.

52. *See also* 7 *Collier on Bankruptcy,* ¶ 1129.02[9][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016).

53. *See In re TCI 2 Holdings, LLC,* 428 B.R. 117, 173 (Bankr. D.N.J. 2010).

54. For example, courts are divided with regard to the term "agreed:" whether this requires a creditor expressly or affirmatively consent to a different treatment, or whether consent may be implied from the creditor's conduct. *Compare In re Teligent, Inc.* (The court approved a novel approach to securing the agreement of some administrative claimants. Through combination of offering a convenience class, and through implementing a well-staffed campaign to induce creditors to return ballots electing to take less than they were owed (since the debtor was administra-

Here, both parties have suggested that it is possible, and it has been done in other cases, for a DIP order to include a provision that automatically disallows or precludes compensation for professionals costs over a certain amount—a *per se* disallowance of administrative claims provision.[55] However, the parties disagree whether paragraph 4(b) of the DIP Financing Order constitutes such a *per se* disallowance provision. Inasmuch as the parties agree that paragraph 4(b) of the DIP Financing Order is unambiguous, no one requested an evidentiary hearing, and there was no testimony before the Court, with regard to the negotiations that led to its wording. The record makes clear that the parties expect the matter to be resolved as a matter of law.

In resolving this dispute the Court follows a basic cannon of construction providing that "a provision in a [court order] is ambiguous only when, from an objective standpoint, it is reasonably susceptible to at least two different interpretations."[56] By the same token, "the parties are bound by the 'objective definition of the words they use to express their intent,' including the specialized meaning of any legal terms of art."[57] Applying these rules of interpretation, the Court concludes that paragraph 4(b) of the DIP Financing Order is not ambiguous. Concurrently, the Court holds that paragraph 4(b) of the DIP Financing Order does not contain any language that can compel an automatic disallowance of Paul Hastings' fees.[58] The

tively insolvent), the court found that all administrative claimants who had not returned a ballot were dimmed to have agreed to the lesser treatment offered in the plan. Integral to the court's ruling in that case was the fact that creditors were also given reason to understand that the debtor intended to take a refusal to respond as an acceptance to a different treatment. Since no administrative claimant had affirmatively objected, this questionable fiction allowed the court to confirm the plan); *and In re Cummins Util., L.P.*, 279 B.R. 195 (Bankr. N.D. Tex.2003) (holding that section 1129(a)(9)(A) requires express consent to a different treatment); *In re Real Wilson Enters.*, No. 11–15697–B–11, 2013 WL 5352697, 2013 Bankr. LEXIS 3997 (Bankr. E.D. Cal. Sept. 21, 2013) (concluding that "courts requiring affirmative consent have the better interpretation of 'agreed' ").

55. *See* Paul Hastings' Omnibus Response to Oaktree's Objection to the Second Interim Application, ¶¶ 11, 63–64, D.I. 1804.

56. *United States v. State of New Jersey*, 194 F.3d 426, 430 (3d Cir. 1999); *see also In re Barnes Bay Development Ltd.*, 478 B.R. 185, 191 (D. Del. 2012); *McDowell v. Philadelphia Housing Authority*, 423 F.3d 233, 238 (3d Cir. 2005).

57. *United States v. State of New Jersey*, 194 F.3d at 430 (citing *In re Unisys Corp.*, 97 F.3d 710, 715 (3d Cir. 1996)).

58. As an example, Paul Hasting attached to its response a DIP order entered in *In re Granite Broadcasting Corp.* (ALG) (Bankr. S.D.N.Y. Jan. 5, 2007). In that case, the DIP order stated that: "[n]otwithstanding anything to the contrary therein, and absent further Order of the Court, (i) in no event during the course of the Chapter 11 Cases will actual payments in respect of the aggregate fees and expenses of all professional persons retained pursuant to an Order of the Court by the Creditor's Committee exceed $450,000 in the aggregate (the 'Creditors' Committee Expense Cap') ... (iii) any and all claims (A) incurred by the Creditor's Committee in excess of the Creditor's Committee Expense Cap or (B) incurred by any professional persons or any party on account of professional fees and expenses that exceed the applicable amounts set forth in the Budget shall not constitute an allowed administrative expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code." The DIP order in that case further stated that: "[e]xcept with respect to the Creditor's Committee Investigation Fund, any claim incurred in connection with any of the activities described in this paragraph 23 shall not constitute an allowed administrative expense claim for purpose of section 1129(a)(9)(A) of the Bankruptcy Code", *see* Paul Hastings' Omnibus Response to Oaktree's Objection to the Second Interim Application, ¶ 64 n.65 and Ex. E, ¶¶ 12(b) and 23, D.I. 1804. This Court offers no opinion as to

wording of Paragraph 4(b) is not different than a standard carve-out provision. It does not connote in any way that the dollar-amount cap would operate as a complete bar against the allowance of administrative claims following plan confirmation. In this respect, the dollar-amount cap was going to come into play if the attempts to confirm a reorganization plan had failed; it was not intended to come into play if a Chapter 11 plan was confirmed.[59] Reinforcement to this conclusion can be found in comparison to other documents negotiated by the parties here. The Confirmed Plan explicitly states that: "[e]xcept as further specified ... and unless otherwise agreed by the Holder of an Administrative Claim and the applicable Plan Debtor or the Post–Effective Date Plan Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than the DIP Facility Claims and postpetition Intercompany Claims) will receive Cash Equal to the Allowed amount of such Administrative Claim ...."[60] The Confirmed Plan continues to provide a clear exception with regard to the Committee's legal professionals: "[t]he fees and expenses of the Creditors' Committee's legal professionals incurred on and after the Committee Settlement Effective Date with Respect to Creditors' Committee Legal Fee Cap Matters shall be subject to the Creditors' Committee Legal Fee Cap. Any amounts incurred by the Creditors' Committee's legal professionals on and after the Committee Settlement Effective Date with respect to the Creditors' Committee Legal Fee Cap Matters *in excess of the Creditors' Committee Legal Fee Cap shall be disallowed* ..."[61] (emphasized added). In light of the above, the distinction in the Confirmed Plan between the period before and after the Settlement Agreement and the failure to include a similar disallowance provision in the DIP Financing Order speak for itself;[62] that is, the DIP Financing Order lacks a language that can be interpreted as an automatic and absolute cap on the allowance of administrative claims.

However, this does not end the matter. Although the Court concludes that the costs incurred by Paul Hastings are not affected by the DIP Financing Order, the

whether it would approve a DIP order containing provisions such as those in the *Granite Broadcasting* order. The point is that there is no such provision in the DIP Financing Order in this case.

**59.** *See In re Barnes Bay Development Ltd.*, 478 B.R. at 189.

**60.** Confirmed Plan Debtors' Fourth Amended Joint Plan of Reorganization (as modified), Article II.A.1., D.I. 1663–1; *see also* paragraph S. of the Confirmed Plan that incorporates section 1129(a)(9) of the Bankruptcy Code, D.I. 1580.

**61.** Confirmed Plan Debtors' Fourth Amended Joint Plan of Reorganization (as modified), Article II.A.5.b., D.I. 1663–1; the "Creditors' Committee Legal Fee Cap Matters" is defined under the Confirmed Plan Debtors' Fourth Amended Joint Plan of Reorganization (as modified) as "any amounts incurred on and after the Committee Settlement Effective Date with respect to the matters set forth in section I.5. of the Committee Settlement Agreement," Article I.A.62.; *see also* paragraph NN.M.70. of the Confirmed Plan, D.I. 1580; Paul Hastings noted that it created a new matter number to ensure accurate time keeping for those limited matters covered by the Creditors' Committee Legal Fee Cap, *see* Paul Hastings' Omnibus Response to Oaktree's Objection to the Second Interim Application, ¶ 66 n.68.

**62.** Because the Court holds that the DIP Financing Order lacks language that can be interpreted as an absolute cap on the allowance of administrative claims, the Court does not reach the question whether a *per se* disallowance of administrative claims provision in a DIP order such as that in the *Granite Broadcasting* order satisfies the consent requirement under section 1129(a)(9) of the Bankruptcy Code. *See* n. 58, *supra*.

confirmation requirement of section 1129(a)(9)(A) only becomes applicable once Paul Hastings' fees have been allowed as administrative claims.

## C. Determination of the Committee's Counsel Compensation

█ The Bankruptcy Code authorizes the bankruptcy court to award a professional "reasonable compensation for actual, necessary services."[63] In fact, the bankruptcy court not only has the power, it has also a duty to independently review fee applications notwithstanding the absence of objections by the trustee, debtor or creditors.[64] In *In re APW Enclosure Sys., Inc.*, Judge Walrath expounded this duty:

> This statutory obligation must be taken seriously by the courts due to the particularities of bankruptcy procedure. The Third Circuit specifically noted the differences between statutory fee cases and bankruptcy cases. *Busy Beaver*, 19 F.3d at 842–43. In the former, the adversary system serves to ensure that fee requests are reasonable, whereas in the latter neither the debtor nor the attorneys for the creditors have an incentive in the "club" atmosphere of the bankruptcy bar to raise objections to fee requests ... Thus, it is the bankruptcy

court's obligation to "protect the estate, lest overreaching attorneys or other professionals drain it of wealth which by right should inure to the benefit of unsecured creditors." *Id.* at 844.[65]

█ In determining the award of compensation, the court considers the nature, the extent, and the value of the professional's services, taking into account factors such as "whether the services were necessary to the administration of, or beneficial at the time which the service was rendered toward the completion of, a case ... [and] whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed ...."[66] For the same reasons, the bankruptcy court cannot allow compensation for services that were not reasonably likely to benefit the estate or were not necessary to the administration of the case.[67] "Analytically, section 330(a) provides a two-tier test for determining whether and in what amount to compensate professionals in bankruptcy cases. First, the court must be satisfied that the professionals performed actual and necessary services. Second, the court must assess a reasonable value for those services."[68] In order to fulfill its duty, the

**63.** 11 U.S.C. § 330(a)(1) (2012) permits the bankruptcy court to award such compensation to professional persons employed under section 327 or 1103 of the Bankruptcy Code; 11 U.S.C. § 331 (2012) allows the bankruptcy court to award a professional an interim compensation or reimbursement of expenses; *see also In re Busy Building Centers, Inc.*, 19 F.3d 833, 841 (3d Cir. 1994) (there the Third Circuit held that section 330 of Bankruptcy Code, "imbues the [bankruptcy] court with discretionary authority," and that the bankruptcy court possesses both the power and the duty to review fee applications; *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253, 258 (3d Cir. 1995).

**64.** *See In re Busy Building Centers*, 19 F.3d at 841; *In re Cal Dive International, Inc.*, No. 15–10458, 2015 WL 9487852, at *2 (Bankr. D. Del. Dec. 28, 2015); *In re Channel Master Holdings, Inc.*, 309 B.R. 855, 861 (2004).

**65.** *In re APW Enclosure Sys., Inc.*, No. 06–11378, 2007 WL 3112414, at *2 (Bankr. D. Del. Oct. 23, 2007).

**66.** 11 U.S.C § 330(a)(3) (2012).

**67.** 11 U.S.C. § 330(a)(4)(A)(ii); *see also In re Cal Dive International, Inc.*, 2015 WL 9487852, at *2.

**68.** *In re Channel Master Holdings, Inc.*, 309 B.R. at 861.

bankruptcy court may appoint a fee examiner to aid it in accomplishing this "onerous burden." [69] Furthermore, the applicant bears the burden of proving that the fees and expenses sought are reasonable and necessary.[70]

■ In this case, the Court believes that a reasonable professional representing the Committee would have performed the services carried out by Paul Hastings.[71] The Court is also confident that the record demonstrates that the services rendered benefited the Debtor's estate and advantaged the Committee's constituents.[72] This is particularly apparent in light of the Settlement Agreement; as the Confirmation Order expressly indicates: "[t]he Committee Settlement Agreement ... confer[s] material benefits on, and [is] in the best interests of, the Debtors, the Debtors' Estates, and their creditors ...."[73]

Given the size and complexity of the jointly administrated Chapter 11 cases, the Court appointed Direct Fee Review LLC (the "Fee Examiner") as a fee examiner.[74] After carefully considering the Fee Examiner's report regarding the Second Interim Application (the "Fee Examiner's Report"),[75] and having given all interested parties an opportunity to justify or object to the Second Interim Application, the Court is satisfied that the fee recommendations advanced in the Fee Examiner's Report succeed in reflecting reasonable compensation for actual and necessary services and reimbursement for actual and necessary expenses. Except as to a few minor reductions, the Second Interim Application was cleared by the Fee Examiner.[76] The Court believes that the Fee Examiner's Report significantly undercuts the position taking by Oaktree in its objections. Thus, the Court will adopt the recommendations set forth in the Fee Examiner's Report and will approve Paul Hastings' fees in the amount of $8,461,396.25 and reimbursement of expenses in the amount of $225,820.83.

**69.** See *In re Armstrong World Industries, Inc.*, 366 B.R. 278, 281 (2007) (citing *In re Busy Building Centers*, 19 F.3d at 843); 11 U.S.C. § 105(a) (2012) (giving the bankruptcy court power to issue "any process" to carry out its duty); Del. Bankr. L.R. 2016–2(j) ("[t]he Court may, in its discretion or on motion of any party, appoint a fee examiner to review fee applications and make recommendations for approval").

**70.** See, e.g., *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253, 260 (3d Cir. 1995); *In re Cal Dive International, Inc.*, 2015 WL 9487852, at *2; *In re Channel Master Holdings, Inc.*, 309 B.R. at 861.

**71.** See *In re APW Enclosure Sys., Inc.*, No. 06–11378, 2007 WL 3112414, at *3 ("[a]t least one court has held that the applicant must show that an actual benefit was provided ... A majority of courts, however, have held that services are compensable if at the time the services were performed a benefit to the estate was likely").

**72.** See *In re 14605, Inc.*, No. 05–11910, 2007 WL 2745709, at *4 (Bankr. D. Del. Sept. 19, 2007) (approving the official unsecured creditors committee's professionals' fees based on further finding that the "investigation resulted in a tangible benefit to the unsecured creditors by facilitating a consensual Plan which provided a substantial recovery for unsecured creditors guaranteed in large part by [the lender]").

**73.** The Confirmation Order, ¶ II, D.I. 1580.

**74.** D.I. 508.

**75.** D.I. 1813.

**76.** The Fee Examiner requested Paul Hastings to review what the Fee Examiner preliminary believed to be certain shortcoming (including miscalculations, duplications, inappropriate or unreasonable charges). Paul Hastings responded to the Fee Examiner's concerns; in some matters Paul Hastings agreed to modify the charges and in other matters the Fee Examiner accepted Paul Hastings' explanations.

## CONCLUSION

Mindful of the importance of its independent duty to scrutinize fee applications, the Court has reviewed the Second Interim Application submitted by the Committee's Counsel's attorneys. For the reasons stated above, the Court holds that the language in the DIP Financing Order leaves no ambiguity with respect to the dollar-amount cap. Thus, under the circumstances of this case, the Court concludes that the costs incurred by Paul Hastings' services are not affected by the DIP Financing Order, and therefore, to the extent they are allowed as administrative expenses they must be paid by the Debtors pursuant to section 1129(a)(9)(A) of the Bankruptcy Code. Additionally, the Court finds that the Second Interim Application falls within the mandates of sections 330(a) and 331 of the Bankruptcy Code. Thus, the Court overrules Oaktree's objections and will approve the fees requested through the Second Interim Application in accordance with the Fee Examiner's Report recommendations.

The Court directs Paul Hastings to submit an order under certification of counsel (upon consultation with Oaktree) consistent with this Opinion approving and directing payment of Paul Hastings' fees and expenses in the amount of $8,461,396.25

and reimbursement of expenses in the amount of $225,820.83.[77]

---

77. While this matter was under advisement, Paul Hastings submitted the Third Interim and Final Fee Application of Paul Hastings LLP as Counsel to the Official Committee of Unsecured Creditors for Period from July 8, 2015 through and Including August 31, 2016 [D.I. 1984] (the "Final Fee Application"). Oaktree raised the same objections to the Final Fee Application as it did to the Second Interim Application. On December 28, 2016, the Court entered an Order approving the Final Fee Application, excluding any fees and expenses subject to the pending objections to the Second Interim Application. For the reasons set forth herein, the Court will overrule Oaktree's remaining objection to the Final Fee Application, will approve Paul Hastings' fees and expenses thereunder and will direct payment of any outstanding fee and expenses under the Final Fee Application. The order submitted under certification of counsel should also address the Final Fee Application.